406 So.2d 168 (1981)
Dwight R. WALTON
v.
WILLIAM WOLF BAKING COMPANY, INC., Paul M. Teeney and Liberty Mutual Insurance Company.
No. 81-C-1209.
Supreme Court of Louisiana.
November 16, 1981.
*170 John L. Lanier, of Pugh, Lanier & Pugh, Thibodaux, for defendant-applicant.
Robert J. Prejeant, of Watkins, Walker & Prejeant, Houma, for plaintiff-respondent.
WATSON, Justice.
The only issue is whether the quantum of damages awarded by the trial court is so excessive that it represents an abuse of discretion. LSA-C.C. art. 1934(3).
Plaintiff, Dwight R. Walton, received a judgment for $317,573.60. In reasons for judgment, the trial court stated that plaintiff will never be able to engage in gainful employment and would receive $75,000 for pain and suffering, $5,000 for future psychiatric and orthopaedic care, $56,084 for loss of past wages, and $164,917.67 for loss of future wages. Walton was injured in an automobile collision with a truck driven by Paul M. Teeney, owned by William Wolf Baking Company, Inc., and insured by Liberty Mutual Insurance Company.[1] Liability of these three defendants was not an issue at trial.
The Court of Appeal affirmed the judgment. 396 So.2d 962 (La.App. 1 Cir. 1981). The Court of Appeal concluded that the trial court was not clearly wrong and that the award did not represent an abuse of discretion. A writ was granted to review the judgment. 400 So.2d 1379 (La., 1981).
Defendants contend that the conclusion that plaintiff is completely disabled is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La., 1978). Further, defendants argue that the award for past lost wages is excessive; that there was no basis to award future medical expenses; and that $75,000 for pain and suffering and $164,917.67 for loss of future wages represent a clear abuse of discretion.
Walton worked as a driller for Delta Drilling Company and earned slightly over $2,000 a month in 1977. In 1976, his wages were $21,226.00. He has a sixth grade education and was fifty-four years old when the accident occurred.[2] In the two years between the accident and trial, Walton incurred medical expenses of $16,571.93. Walton's initial injuries consisted of a moderate to severe cervical strain, moderate to severe cervical spondylosis, and degenerative cervical changes. However, he developed a depressive reaction secondary to a pain syndrome. According to the trial court, fourteen doctors regard Walton's complaints as unique, but sincere. The medical findings were summarized as follows:
"... cervical strain superimposed upon cervical osteoarthritis; increased deep tendon reflexes of lower extremities; lack of normal lodortic curvature of the spine with formaminal encroachment on the right at C-4 and C-5; cervical spondylosis further degenerative diseases at C-4; grossly abnormal MMPI showing psychophysiological conversion type pattern of a chronic nature; diminished sensation involving the palm and radial aspect of the hand; bilateral absence of deep tendon reflex; moderately severe degenerative changes of C-3, C-4, C-5 and C-6 disc spaces; pain syndrome making normal range of motion of the neck difficult; headaches; insomnia; chronic pain; four periods of hospitalization totalling 48 days...." (Tr. 50)
Defendants contended at trial and now that Walton is a malingerer. The trial court found a disparity between Walton's subjective and objective disability, but attributed the differential to the psychosomatic overlay from the accident. Defendants introduced surveillance films, but the court noted:
"Practically all of the footage shows plaintiff walking in a stiff and deliberate manner and corroborates the findings of the physicians." (Tr. 51)
The court observed Walton for two days during trial and was convinced that malingering would be totally out of character *171 with his history and the appearance presented to the court. Also, the court noted: "The common thread to the many doctors' opinions in the record is that Mr. Walton is not a malingerer." (Tr. 51)
The accident occurred late in the afternoon on May 31, 1977. Walton was unconscious for the first few minutes after the impact. His wife called a doctor that evening. Walton could not see the physician without going to the hospital and decided to put it off until the next day. His wife helped him dress the following morning. He worked in pain that day. When he came home from work, he looked extremely worn and his wife made an appointment for him to see Dr. Phillip Cenac the next afternoon. Walton has been unable to return to work since seeing the doctor. His incapacity has increased with the passage of time. Traction and physical therapy have not improved his condition, although the therapy provides some pain relief. At the time of trial, Walton was faithfully going to a physical therapy clinic three times a week. Some days are not as painful as others; he has good and bad days. Walton can let his left arm hang down but it hurts when he does so and therefore he carries it above the waist with his other hand.
Except for an ulcer operation in 1956 or 1957, Walton enjoyed excellent health before the accident. According to the testimony of both spouses, Walton has largely abandoned his hobbies of fishing, hunting, and gardening. His wife encourages him to cut the grass. Their garden has been reduced in size. Walton attempts as much physical activity as he can and helps cut the grass around his house with a power mower.
Walton started working in the oil field as a roughneck at the age of seventeen and has remained in that field except for a period of service with the government. He had been a driller since 1945. A driller supervises the operations of a rig drilling crew but is required to take an active part in the operation. Walton once tried to do some dairy work but his wife had to assist him because he did not have the education and clerical skills to make out the bills.
Walton testified that he went to see Mr. Maten, a tool pusher for his former employer, Delta Drilling Company. Maten told him he could not drill anymore, so he went to the state employment office in Houma. The state employment office recommended that he talk to the vocational rehabilitation office where he had an interview with one Hornsby. Hornsby told Walton that he could not recommend anything to him.
Dr. Christopher E. Cenac testified as an orthopaedic expert about his treatment of Walton. Walton came to him on referral from Dr. Phillip Cenac's office and was first seen on June 16, 1977. Walton was diagnosed as having an acute cervical strain and admitted to the hospital on June 23 for four days of cervical traction and physical therapy. Physical therapy was continued after release from the hospital, but Walton complained of weakness in the left upper extremity. Walton was referred to Dr. Michael E. Carey, professor of neurosurgery at the L.S.U. Medical Center. Dr. Carey performed a myleogram; it did not indicate a surgical situation. Dr. Carey's report states Walton's "MMPI... is grossly abnormal and showed a psychophysiological conversion type of pattern of chronic nature." Dr. Carey also felt that Walton had "cervical osteoarthritis and cervical sprain consequent to his automobile accident." Dr. Cenac continued to see Walton who complained of shoulder and arm pain. Dr. Cenac noted a diminishing range of motion in the cervical spine, and possible dystrophy of the left upper extremity. Arrangements were made for admission to the Mercy Hospital Pain Unit.
Dr. Richard H. Morse, a psychiatrist, is director of the Mercy Hospital Pain Center. The pain unit specializes in chronic pain problems which have originated in a physical cause, have not responded to medical or surgical intervention and have developed an emotional overlay. Walton was admitted on April 27, 1978, and stayed four weeks as an inpatient. He was seen by an internist, a neurologist, an orthopaedist, a neurosurgeon and a psychologist. When Walton *172 was admitted, he was taking Tylenol and Placidyl, a sedative. Dr. Morse prescribed Elavil, an antidepressant, and Prolixin, a tranquilizer, but Walton had a low tolerance for these medications. When he was discharged, he was taking a muscle relaxant, Dantrium, twenty milligrams twice a day.
The psychological evaluation of Walton at the pain unit revealed a reactive depressive neurosis. The report of Dr. Robert A. McFarlain, a clinical psychologist, states that Walton has "a significant depression and that his pain complaints are being exacerbated by his depression." In the opinion of the doctors, Walton was depressed because of loss of his earning capacity and ability to work. During treatment, Walton reached a less depressed state. There was no evidence of job avoidance.
The doctors at the pain unit felt that Walton had "truly anatomical pain" (Morse Depo., p. 16). They said Walton is "a very honest and nonmalingering person" who "actually did feel the pain he described" (Morse Depo., p. 22). His descriptions reflect a genuine pain experience. In Dr. Morse's opinion, Walton suffers chronic pain on a constant daily basis. He does not respond well to nerve blocks. Walton was described as a person of strong personal morality who would find it difficult to dissemble or lie, a "sincere and salt-of-the-earth person" (Morse Depo., p. 23).
Dr. Morse defined Walton as a person of limited education from a hard background whose main identity was that of a good worker. The loss of working ability at his age represented a hopeless situation to him. According to the tests at the pain unit, Walton has good dexterity and average intelligence, but limited endurance.
When Walton was discharged, Dr. Morse believed that he could perform "light to moderate physical work activity" (Morse Depo., p. 22). However, Walton "... could not, as he formerly did, engage in heavy lifting", climb steps, move quickly or work in hazardous circumstances (Morse Depo., p. 27). In Dr. Morse's opinion, Walton could work as a drilling supervisor "provided he would have some ability to pace himself and he did not go into hazardous exposure such as bad weather, slippery equipment" (Morse Depo., p. 36).
The discharge summary on Walton from the pain unit notes that he has a depressive reaction which exacerbates his pain. He has a "perplexing" intensity of pain and disability. He is reported as "overwhelmed" by "paper and pencil tasks".
The report recommends that Walton continue with physical therapy on the outside. It is noted that Walton rapidly resumes "his splinting posture and frozen neck" after physical therapy and nerve blocks. Under "Current Problems", the summary states:
"VOCATIONAL-EDUCATIONAL: The patient expresses a very strong desire to return to work. Prognosis of returning to his former occupation remains very guarded in light of the patient's age, and the heavy labor he formerly pursued."
Dr. Eugene J. Dabezies, an expert in orthopaedic surgery, treated Walton at the Mercy Pain Unit and testified in deposition that Walton has cervical spondylosis, a chronic pain problem, psychological overlay and an arthritic neck. Dr. John F. Schuhmacher, a neurosurgeon, evaluated Walton in association with the Mercy Hospital Pain Clinic. He diagnosed Walton as having a stiff neck, degenerative disc changes, spurring in the spine, preexisting cervical spondylosis aggravated by the accident and psychological overlay.
After Walton's discharge from the pain clinic in July of 1978, he continued to have pain and edema in the left upper extremity and hand. Dr. Cenac admitted him to the hospital for treatment of reflex sympathetic dystrophy, a progressive disease process in which an extremity swells, reddens, and sweats. The afflicted individual holds his hand or foot in a fixed position and maintains that posture until the extremity becomes useless. One of the components of dystrophy is causalgia, a constant burning pain. The disease is associated with trauma but is probably caused in part by Walton's conversion reaction. Its origin has never been precisely determined in anyone. It *173 was evident in Walton as early as August, 1977. The initial treatment is oral medication to which Walton did not respond. Dr. Cenac then tried cervical or stellate ganglion blocks to decrease sympathetic nervous system activity and increase the blood flow to the extremities. The blocks reverse the disease process for a period of seventy-two hours. As in thirty percent of the cases, the blocks failed here and surgery would also have been useless. On August 28, 1978, Walton again had dystrophy of the left hand. He was unresponsive to oral medication and was admitted to the hospital on September 10, 1978, for five successive cervical blocks. The pain, swelling, and stiffness in the left hand, shoulder, neck and arm were undiminished and it was felt that neuropsychiatric care was in order. Walton was referred to Dr. Keller, a specialist in rheumatoid diseases, and Dr. Homer Kurgis, a neurosurgeon.
Dr. Karl E. Keller, a rheumatologist, reported that Walton suffers from moderately severe cervical spondylosis and a pain syndrome, but no rheumatic disease. The deposition of Dr. Homer Kurgis is not significant.
At Dr. Christopher Cenac's last examination, the day before trial, Walton was diagnosed as having reflex sympathetic dystrophy in the left upper extremity, ankylosis of the cervical spine subsequent to a traumatic sprain of the neck, osteoarthritic changes in the neck, and anxiety conversion reaction and significant cervical spondylosis. Walton has gross hand function, but lacks coordinated fine movements of the hand, shoulder and elbow.
In Dr. Cenac's opinion, Walton's reflex sympathetic dystrophy is causally related to the trauma of the automobile accident. Walton's complaints of constant daily pain are consistent with Dr. Cenac's clinical findings. Dr. Cenac examines people for work in the oil field. In his opinion, Walton is unemployable as a driller or oil field worker. Due to Walton's limited educational background, age, loss of function of an entire upper extremity and limited range of motion of the cervical spine, the chances of successful vocational rehabilitation training are minimal. Walton was described as totally disabled.
Dr. Cenac testified that Walton will require orthopaedic and psychiatric treatment in the future. The primary treatment regime will be psychiatric but Walton will need approximately $500 a year in orthopaedic treatment for at least three years, or a total of $1,500.
Three employees of Equifax Services did surveillance of Walton and filmed him mowing his lawn, driving a pickup and carrying groceries. Dr. Cenac testified again after viewing these films and said they demonstrated more range of motion than he had observed during treatment. Although Walton did not display a normal range of motion, he showed more function than he had displayed in the doctor's office. From a purely orthopaedic standpoint, the movies indicated Walton can return to some gainful employment. However, Dr. Cenac still would not approve him for oil field work because of his dysfunction and abnormal posture. Walton's symptomatology is unique in Dr. Cenac's experience.
Kenneth Anderson Barrilleaux, a physical therapist, treated Dwight Walton from June 14, 1977, through the month of trial, seeing him three to five times a week. In twenty-five years, Barrilleaux had not seen anyone with Walton's degree of disability and pain, but he has no reason to believe that Walton is faking or malingering.
Dr. Clayton Byron Edisen, a board certified psychiatrist, testified as an expert in that field. Dr. Edisen also practices neurology and has had neurological training. Dr. Edisen saw Walton on April 10, 1979, almost two years after the accident on May 31, 1977. Walton was supporting his left hand and had his chin down in a stiff position. In Dr. Edisen's opinion, the posture was caused by a physical condition, holding the left arm in a slinglike manner and keeping the neck rigid being the most comfortable for the patient. Dr. Edisen felt the position was voluntary in the sense that Walton was avoiding pain. Dr. Edisen said Walton is depressed, with unmotivated sadness, *174 an apathetic face, decrease in libido, insomnia, self-isolation and difficulty in concentration. In Dr. Edisen's opinion, Walton's self-concept of himself as "a little mule", a person that could work as hard as anyone, had been wiped out by the accident. (Tr. 146)
Dr. Edisen did not believe Walton was feigning his symptoms and thought the patient too unsophisticated to consciously present a classic syndrome of depression. Walton was described as honest, sincere and cooperative. In Edison's opinion, Walton was not suffering from compensation neurosis and his depression would not be alleviated by a cash award.[3] Edisen reviewed eighteen reports in evaluating Walton. Dr. Edisen diagnosed a depressive neurosis reaction secondary to the accident and failure to improve physically following the accident. Dr. Edisen concluded that Walton is incapable of doing manual labor and will remain depressed because of his inability to work.
Apart from his depression, Walton has tingling sensations in the fingers of both hands, numbness and weakness of grip strength in the left hand, headaches, dizziness, difficulty with balance, inability to rotate the head, some weakness in grip strength in the right hand, stiffness in the fingers of both hands, an involuntary muscle tremor of the left arm, palpable muscle spasms in the neck and shoulders, an absent reflex in the left biceps, and a decreased reflex on the right. Although the palpable muscle spasms in the neck are a physical symptom, depression may contribute to the spasms. Walton displays classical symptoms of cervical spondylosis. In Dr. Edisen's opinion, the pain and muscle spasms would render Walton incapable of manual labor even if he were not depressed. To Dr. Edisen, Walton's prognosis is bleak.
Dr. James A. Knight, a professor of psychiatry at the L.S.U. School of Medicine, testified as an expert. He saw Walton in March of 1979 and described him as obviously depressed with the same rigid posture noted by Dr. Edisen. To Dr. Knight, Walton's major problems were psychological. On the basis of the MMPI test Dr. Knight concluded that Walton had had a well established neurotic pattern before the accident. His condition was diagnosed as a depressive reaction. In Dr. Knight's opinion, physiotherapy, some other "modalities of treatment", (Tr. 192) supportive therapy and end of the litigation could restore Walton to a functional state.
Dr. Kenneth J. Boudreaux, a professor of economics and finance at the Tulane Graduate School of Business, testified as an expert on behalf of defendants. At the time of the accident Walton's work life expectancy was eleven years. As of trial, the work life expectancy was 9.2 years. Using an annual salary of $24,000 and discounting at the rate of 8.5% per annum, Dr. Boudreaux calculated Walton's loss of earnings for the remainder of his work life expectancy at a present value of $158,609.55. Using a 4% annual inflation figure, the loss of earnings would be $184,827.10. If Walton had received a 2.5% annual increase in wages, his loss of income would be $204,187.87. In view of Walton's age, this expert would not consider significant wage increases a valid factor. Walton's loss of income from the date of the accident to the date of the trial was calculated at $50,715.
Dr. John W. Chisholm, plaintiff's expert economist, testified that Walton had a work life expectancy of 11.7 years at the time of the injury. Dr. Chisholm said that Walton's lost wages between the accident and the trial were $43,064.50. Assuming no wage increases during the remainder of his working life, Chisholm estimated loss of future earnings of $223,334.50. Discounted at five percent, the amount would be $183,638.66; discounted at six percent, the present value would be $177,163.72. Dr. Chisholm pointed out that for Walton, a man of limited education and investment sophistication, the five percent figure is more realistic. According to Dr. Chisholm, the average annual productivity increase in wages in the United States from 1950 through 1975 was *175 2.8 percent. Assuming an annual wage increase of 2.8 percent, Walton's future wages discounted at five percent would amount to $195,271.12; discounted at six percent the figure would be $186,052.58. Adding an inflation figure of four percent, the sum would be $230,204.77 at a five percent discount, and $218,834.39 at a six percent discount.
Dr. Chisholm testified that the annual inflation figure has been over three percent for the last fifteen years. In his opinion, the four percent inflation figure is ultra-conservative to the point of being unrealistic. Dr. Chisholm testified that the probability was that Walton would have continued working until the age of 65.7 years, the statistically average retirement age.
Irby Hornsby, Jr., a counselor with the State Department of Vocational Rehabilitation, testified that his job involves trying to place handicapped individuals back in employment. Walton was referred to his office by the Louisiana State Employment Agency. Hornsby testified that, because of Walton's age, then fifty-six, educational background, overall intelligence, poor memory, and physical symptoms, he was not "rehabilitation material" (Tr. 266). On the Wechsler intelligence test, Walton scored 84 whereas the average is between 90 and 110. In Hornsby's opinion, Walton is incapable of returning to full-time gainful employment and it would be difficult to place him in part-time employment, despite his interest in returning to work.
There is no real conflict in the medical evidence. There is some uncertainty about the exact degree of Walton's physical disability. The films show a limited range of motion for short periods of time. Some physical disability is clear from the palpable muscle spasms still present in the neck. Even if these spasms result from Walton's rigid posture, they are unfeigned and involuntary. They relate back to the accident and are compensable. See Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La., 1974). Dr. Edisen's diagnosis of Walton's physical condition is challenged by defendants as being beyond that doctor's expertise. However, Dr. Edisen has had neurological training and practices neurology.
There is no dispute among the experts about Walton's mental incapacity. Dr. Knight indicated that Walton was predisposed toward neurosis. Although he functioned well before the accident, his reaction to the injury was more severe than that of most people. This does not lessen the tort-feasor's responsibility to compensate Walton for all the consequences of the accident. A tort-feasor takes the victim as he finds him. Perniciaro v. Brinch, 384 So.2d 392 (La., 1980); Reck v. Stevens, 373 So.2d 498 (La., 1979). Dr. Knight felt that the depression could be successfully treated. Dr. Edisen did not agree. The trial court adopted Dr. Edisen's view that Walton will remain depressed and unemployable.
Defendants rely heavily on Dr. Morse's testimony to establish that Walton is able to work. However, the limitations which Dr. Morse prescribed are incompatible with oil field work, Walton's only field of expertise. Walton is incapable of clerical work according to the discharge summary from the pain unit and his own testimony. The state employment office and the state office of vocational rehabilitation offered him no prospect of employment or rehabilitation. His peculiar posture would certainly deter prospective employers. The trial court's conclusion that Walton is unable to work is reasonable and certainly not clearly wrong.
The jurisprudence cited by defendants' able attorney is of little assistance in gauging whether this award is excessive. No two cases are exactly alike, and each must stand on its own facts. Reck v. Stevens, 373 So.2d 498 (La., 1979); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971).
Walton's testimony about the pain he has endured is corroborated by the medical history. Recompense for pain and suffering "... cannot be calculated with any mathematical precision." Boutte v. Hargrove, 290 So.2d 319 at 322 (La., 1974). The *176 $75,000 award for pain and suffering is not excessive.
Walton's future orthopaedic treatment was estimated at $1,500. Defendants' expert, Dr. Knight, agreed with Drs. Cenac and Edisen that future psychiatric treatment will be needed. There is no testimony about the estimated cost. Considering the price of Walton's past treatment, the $3,500 awarded by the trial court for this item of damages is not excessive. Where the right to damages is clear but there is no exact estimate of cost, a reasonable assessment can be made by the trier of fact. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
The $56,084 awarded for loss of past wages is higher than the figure of $50,715 calculated by Dr. Boudreaux. However, Dr. Boudreaux assumed that Walton's wages would not have increased. Since Walton received a raise of almost $3,000 between 1976 and 1977, the trial court could have assumed similar raises between 1977 and 1979. Loss of wages can be computed on the amount a plaintiff would in all probability have been earning at the time of trial. Coco v. Winston Industries, Inc., 341 So.2d 332 (La., 1976). Damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury. Folse v. Fakouri, 371 So.2d 1120 (La., 1979). The award for loss of past wages does not represent an abuse of discretion.
A larger amount for future loss of wages could have been justified on the evidence presented.
The evidence supporting the trial court's award of damages is overwhelming. Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La., 1974).
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
NOTES
[1] The liability of Liberty Mutual Insurance Company was limited to its policy limits of $250,000.
[2] His parents died at the ages of eighty-seven and eighty-six, both of old age.
[3] Walton first saw his trial attorney about a year after the accident.