552 So.2d 673 (1989)
Wilmer Loyd SPANGLER, Jr., et vir, Plaintiffs-Appellees,
v.
NORTH STAR DRILLING COMPANY, Defendant-Appellant.
No. 20,885-CA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 1989.
As Corrected November 7, 1989.
*675 Juneau, Hill, Judice, Hill & Avery by Patrick Juneau, Lafayette, Cook, Yancey, King & Galloway by Sidney E. Cook, Shreveport, for appellant.
Paul B. Wilkins, Columbia, for appellees.
Before HALL, C.J., and MARVIN and SEXTON, JJ.
*676 HALL, Chief Judge.
Plaintiffs, William Loyd Spangler, and his wife, Sheila Spangler, brought this action pursuant to the Jones Act, 46 U.S.C. App. § 688, and general maritime law. Plaintiffs asserted that Mr. Spangler sustained severe back injuries while working for the defendant, North Star Drilling Company, as a driller on a semi-submersible drilling rig, the Alaskan Star. They asserted that North Star breached its warranty of seaworthiness in that the braking system for the drawworks of the Alaskan Star was defective and that North Star was negligent in failing to repair the braking system after it had knowledge of the defective condition. North Star defended by alleging that the braking system was not defective and that the accident was caused by operator error. The trial court found that North Star breached its warranty of seaworthiness under general maritime law and was negligent pursuant to the Jones Act. It awarded Mr. Spangler damages of $7,213,756 which included $1,203,439 in compensatory damages, $600,000 in general damages, and $5,410,317 in punitive damages. The court awarded Mrs. Spangler $75,000 on her claim for loss of consortium, society and services. North Star appealed suspensively asserting 15 assignments of error.

FACTS
On September 15, 1986, plaintiff was working as a driller aboard the Alaskan Star,[1] a semi-submersible drilling rig, in the Gulf of Mexico. The plaintiff had been "tripping pipe", adding additional joints to a string of pipe, for about 45 minutes before the accident occurred. It was established that the plaintiff had made about 15 joints of pipe without mishap.
As required, the plaintiff had his right hand on the brake handle while operating the drawworks. He engaged the clutch with his left hand. Typically, after the clutch is engaged, the brake handle should slowly rise about four to six inches. However, on this occasion the brake handle jerked violently upward and caused the plaintiff to immediately feel pain in his back. Plaintiff stated he completed his shift in pain, thinking that he had only pulled a muscle. The pain increased and eventually plaintiff had to return to shore for medical treatment. Later, he underwent several myelograms, an MRI and two back surgeries as a result of this accident.

SCOPE OF REVIEW AND LAW APPLICABLE
Plaintiff brought his action in state court pursuant to 28 U.S.C. § 1333, the "savings to suitors" clause. The Louisiana Supreme Court has held that federal substantive admiralty or maritime law applies to such an action. Laverqne v. Western Company of North America, Inc., 371 So.2d 807 (La.1979). The trial court's finding concerning seaworthiness and negligence are findings of fact that may not be disturbed unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Stevens v. East-West Towing Company, Inc., 649 F.2d 1104 (5th Cir.1981); Portier v. Texaco, 426 So.2d 623 (La.App. 1st Cir.1982). The claims of negligence and seaworthiness are separate and distinct claims. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

DEFENDANT'S LIABILITY (JONES ACTSEAWORTHINESS)
Under the Jones Act, "any seaman who shall suffer personal injury in the course of his employment may, at his selection, maintain an action for damages at law", against his employer. 46 U.S.C.App. § 688. Seaman status is established for purposes of the Jones Act if the claimant is able to show, 1) that he was assigned permanently to a vessel or performed a substantial part of his work aboard a vessel, and 2) that the capacity in which he was employed or the duties in which he performed contributed to the function of the vessel or the accomplishment of its mission. Offshore Company v. Robison, 266 F.2d *677 769 (5th Cir.1959)[2]; Billings v. Chevron, USA, Inc., 618 F.2d 1108 (5th Cir.1980). In this case, the plaintiff was a driller aboard a semi-submersible drilling rig. In Robison, supra, the United States Fifth Circuit Court of Appeal held that vessels included special purpose structures not usually employed as a means of transport by water but designed to float on water. In this case, the status of the rig as a vessel was not challenged by the parties. The rig was located in the Gulf of Mexico and the plaintiff was permanently assigned to the rig. He contributed to its mission, exploration for minerals.
Under the Jones Act, a vessel owner is deemed negligent if it fails to exercise reasonable care to maintain a reasonably safe work environment. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir. 1982). Because of the remedial nature of the Jones Act and its imposition of a higher standard of care on employers, liability results upon a showing of only "slight negligence." Allen v. Seacoast Products, Inc., 623 F.2d 355 (5th Cir.1980).
Under general maritime law, a vessel owner has an absolute duty to furnish a seaworthy vessel, that is a vessel and appurtenances which are reasonably safe and fit for their intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Ceja v. Mike Hooks, Inc., supra. Among the conditions which render a vessel unseaworthy, thus imposing liability on a vessel owner for injuries occasioned thereby, are defective gear, appurtenances in disrepair, and an unfit or insufficient crew. Usner v. Luckenbach Overseas Corp., supra. The seaman's burden in an unseaworthiness case is to show that the vessel was unseaworthy and that that condition caused his injury.
In this case, the plaintiff alleges that the Alaskan Star was unseaworthy because a defective condition existed in an appurtenance, the drawworks braking system. In the alternative, he asserts that North Star was negligent in failing to repair the drawworks after it had knowledge of its tendency to severely kick operators. Defendant contends that the plaintiff's evidence fails to show that the drawworks brake was defective and therefore, the trial judge was erroneous in his conclusions that the Alaskan Star was unseaworthy and that North Star was negligent.
At trial, the proper procedure for operating the drawworks was established as follows:
1. The blower on the drawworks motors is turned on;
2. the speed of the motor is set with a rheostat, which is not adjusted during the operation of the drawworks once it is set;
3. a clutch is activated with the left hand, and the brake handle should rise four to six inches;
4. then the accelerator is depressed and the brake handle should rise smoothly to form a 75° to 80° angle with the driller's shack floor.
The plaintiff testified that the drawworks brake could "kick" by operator error, but that he had followed the proper procedure of operation when he was kicked. Although some witnesses who testified at trial had seen other drawworks brakes "kick", there was testimony that the drawworks brake on the Alaskan Star kicked its operators more severely than other drawworks.
Plaintiff called Joe Stewart, a former tool pusher on the Alaskan Star, to testify in regards to an injury that he had received when kicked by the drawworks brake on the Alaskan Star. He operated the drawworks in January of 1986 and received a severe kick. The brake kicked him so hard on this occasion that it jerked out of his *678 hand and broke a metal plate that had been installed to stop the brake during a severe kick. Joe Stewart also underwent back surgery because of the kick that he received. He stated that he did nothing to cause the brake to kick by operator error.
Donny Stewart, an assistant driller, testified that the drawworks brake had kicked him so hard on one occasion that it knocked him to the floor. Others in the drillers shack had to grab the brake to prevent an accident on the derrick floor.
George Green, a mechanical engineer, was called as an expert by the plaintiff. He stated that there were two types of kicks usually associated with drawworks brakes, a mild one, usually caused by operator error, and a severe one, usually caused by equipment malfunction. He identified through photographs areas on the drawworks braking system that indicated to him that the pins and bushings may be worn. The cost of repairing the pins and bushings was estimated at $3,000. Further, he stated that wear of the pins and bushings could only be measured by disassembly of the entire braking system.
Defendant called several witnesses who testified that the pins and bushings were inspected and determined to be in proper working order. Defendant's expert in mechanical engineering, Dr. Gerald Whitehouse, stated that he examined the pins and bushings on the drawworks brake after the accident and saw nothing that indicated a need for replacement. He stated that since the drawworks had been operated 15 times without mishap and then suddenly kicked, the problem was probably operator error. He felt that any mechanical defect would manifest itself each and every time the drawworks was operated. He measured the slack in the pins and bushings and stated that it was within tolerances, but on cross he seemed to contradict this finding in that his measurement of the slack was within the problem range described by the manufacturer.
Plaintiff's expert testified that the defective condition, worn pins and bushings, was one that would not necessarily manifest itself on each operation. He stated that severe kicks could occur at any time without warning.
In summary, the plaintiff tried to prove the defective condition by the summation of several bits of circumstantial evidence. He established through witnesses that the drawworks had "kicked" several people in the past. Testimony also revealed that this drawworks kicks harder than other drawworks in normal use. One witness stated that you really had to be on your toes when operating this particular drawworks. Plaintiff's expert stated that photographs showed enough slack in the pins and bushings to indicate that they were worn enough to cause a kick. Defendant's expert, who had actually examined the drawworks, contradicted the plaintiff's expert. Experts on both sides agreed that to actually determine if the pins and bushings were worn, the system would have to be disassembled and measurements for wear taken. This procedure was never accomplished by either the plaintiff's or the defendant's experts. In this case the kick was caused either by a defective braking system, operator error, or a combination of those things. Whether the plaintiff's evidence established the exact mechanical defect which caused the kick is not dispositive. The fact that he established that this particular drawworks had a tendency to kick more severely than other drawworks was enough to establish that this drawworks was unreasonably dangerous while in normal use. Therefore, the drawworks was not fit for its intended use and the trial court could reasonably conclude that North Star had breached its warranty of seaworthiness under general maritime law.
To prevail in his negligence action the plaintiff has to show that the defendant failed to exercise reasonable care in the maintenance of a safe work environment. Ceja, supra. In contrast to a claim for unseaworthiness, it is the conduct of the defendant which is at issue not the defective condition itself. Under the Jones Act, an employer is liable for the injuries negligently inflicted on its employees by its agents, officers and employees. Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 *679 L.Ed.2d 740 (1966); Portier v. Texaco, supra. There is an abundance of evidence in the record supporting the plaintiff's proposition that North Star did not correct the severe kicking problem with this drawworks. In 1985, North Star installed a brake equalization device, "anti-kickback device", based on a recommendation by the drawworks manufacturer. Despite this action severe kicks continued to occur. After the injury to Mr. Stewart, the rig was "stacked" for some time, yet North Star did not investigate the kicking problem. Company officials all along contended that inspections both before and after this accident have not revealed a problem with the pins and bushings and therefore, they have not deemed replacement of those items necessary.
Gerald Lavoy Mauldin, a representative of the drawworks manufacturer, testified that the pins and bushings in this type of drawworks were typically showing wear after two or three years of use. This fact was made known to North Star by a brochure sent by the manufacturer to North Star. North Star contends that the pins and bushings on this particular drawworks did not show any wear and tear and were not replaced despite over ten years of use in this drawworks. The procedure to replace the pins and bushings would have taken a few hours and cost only about $3,000. North Star, however, through its experts continues to insist that the procedure is not needed. Given the fact that two injuries have occurred to drillers on the Alaskan Star, it seems that the more reasonable approach would be to do something more than a visual inspection of the pins and bushings. The senior tool pusher and rig engineer on the Alaskan Star knew of the injury to Mr. Stewart and yet took no action other than their usual inspections that had occurred in the past. We agree with the trial court that the plaintiff has carried his burden, often termed featherweight, Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir.1977), of proving Jones Act negligence. The judgment of the trial court in this regard is not clearly erroneous.

PLAINTIFF'S NEGLIGENCE
The trial court found that the plaintiff was not negligent and that in any event his negligence was not for consideration in a seaworthiness case. While it is true that the judge may have misspoke because it is clear that any negligence by plaintiff would mitigate his recovery under either the Jones Act or general maritime unseaworthiness, Allen v. Seacoast Products, Inc., supra; Spinks v. Chevron Oil Company, 507 F.2d. 216 (5th Cir.1975), it is equally true that the seaman's duty to protect himself is slight. Spinks, supra; Ceja, supra. "The duty of a seaman to use reasonable care is tempered by the realities of maritime employment which have been deemed ... to place large responsibility for his safety on the owner." Mahnich v. Southern S.S. Company, 321 U.S. 96, 103, 64 S.Ct. 455, 459, 88 L.Ed. 561 (1944); Ceja v. Mike Hooks, Inc., supra.
In this case, an employee of defendant testified that workers in the oil industry are required to work at a fast pace. The job of the worker may actually depend on him maintaining a fast performance throughout a day of work. Further, it was established that if you weren't careful with this drawworks, it would kick you. In the words of an employee of the defendant, Mr. Roger Griffin Humphrey, referring to running the Alaskan Star drawworks, "it leaves very little room for error." Because of the slight duty on the plaintiff to protect himself and the nature of his work requiring a fast pace yet precision performance, we find that the trial court was correct in concluding that plaintiff was not at fault.

DAMAGES
Past and Future Lost Wages
Appellant asserts that the trial court erred in relying on the plaintiff's economist in regard to past lost wages and future lost wages. The court stated in its reasons for judgment that it believed the testimony of Dr. Charles O. Bettinger, the plaintiff's expert economist. Appellant argues that the calculations concerning these items of *680 damage are more properly accomplished by its expert, Dr. Kenneth J. Boudreaux.
Both economists testified that they were supplied with plaintiff's 1984, 1985 and 1986 income tax returns. Appellant asserts that the plaintiff's expert erred in calculating the plaintiff's average pre-accident income because he failed to use the income figures for the year 1986. Plaintiff did not work a complete year in 1986 due to this accident. Further, it appears that his income would have been significantly less in this one particular year than it had been in past years. Loss of wages can be computed on an amount the plaintiff would in all probabilities have been earning at the time of trial and damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury. Walton v. William Wolf Baking Co., Inc., 406 So.2d 168 (La.1981); Folse v. Fakouri, 371 So.2d 1120 (La.1979). While the use of the 1986 return showing income of the plaintiff up to the time of injury would have reduced the average income factored over three years, it is apparent that the 1986 income figure may have been an aberration in the plaintiff's income. Typically oil field workers do not experience decreases in pay over an extended period of time. Because the plaintiff did not work the entire 1986 year and because this year reflected a decrease in income which may have been an aberration from his normal income, we find that it was not an abuse of discretion to calculate the average income based on the 1984 and 1985 tax returns. These years were ones in which the plaintiff was able to work the entire year and are reflective of the amount of income he typically had on average.
Plaintiff's gross past lost wage was estimated at $69,741.00 by his expert. In an admiralty case, it is appropriate to award an amount consistent with plaintiff's after tax earnings. Norfolk and Western Railway Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); Portier v. Texaco, Inc., supra. In this case, the plaintiff's expert testified that the plaintiff had typically been exposed to an 11% tax rate considering his allowed deductions. Although defendant's expert calculated the rate at around 13.4%, we do not feel that the trial court erred in accepting the plaintiff's expert's estimation of tax rate which the trial court applied in awarding plaintiff $62,070. However, defendant points out that the trial court erred in failing to take into account F.I.C.A. taxation, citing Pickle v. International Oilfield Divers, 791 F.2d 1237 (5th Cir.1986). Finding merit to the defendant's claim in this regard, we will reduce both the past and future wage award by 7.5%, which defendant's expert testified was the amount of F.I.C.A. taxation applicable in this case. Therefore, the trial court's award of $62,070 in past lost wages is reduced by 7.5% of the gross to $56,838.91 to reflect the amount of F.I.C.A. taxation that plaintiff would have had to pay.
Next, the defendant argues that the award for future lost wages is improperly calculated. The proper method for calculating future lost wages is set out in Culver v. Slater Boat Co., 722 F.2d. 114 (5th Cir.1983). The four step procedure outlined in this opinion stated that the calculation involves:
1. estimating the loss of work life resulting from the injury;[3]
2. calculating the income stream;
3. computing the total damage; and
4. discounting that amount to its present value.
In this case, both experts purported to have followed this procedure. Yet, plaintiff's expert estimated the pre-tax loss to be at $990,206. The trial court reduced this award by 11% to an amount of $881,284 to reflect taxation. Defendant's economic expert in his estimate of loss of future income most favorable to the plaintiff estimated that loss at $501,892.
The difference in these estimates is explained by a number of factors. Defendant's *681 expert estimated a shorter work life expectancy, he did not consider that the plaintiff may have had increases in pay due to promotions or other societal factors, he used a higher tax rate, he used a lower average salary, and he used a larger discount rate.
There is no way to calculate the exact amount of income a particular person would have earned in the future. As stated in Culver, supra at p. 121, "arriving at a reasonable estimate of anyone's financial future involves a whole spectrum of factors ... we must remember that the ultimate total damage awarded is the sum of a series of predictions, none of which involves a mathematical certainty, and that it is the reasonableness of the ultimate figure that is really in issue in such a case as this." We do not think the trial court's award in this case unreasonable.
As noted before, the trial court did not subtract any F.I.C.A. taxation from his award of future lost wages, though he did subtract an 11% income tax rate. Therefore, we subtract an additional 7.5% to reflect F.I.C.A. taxation as per the Pickle decision.
Defendant argues that the trial court erred in refusing to consider its vocational rehabilitation expert's testimony. The rehabilitation expert testified that according to the U.S. Bureau of Labor Statistics, there were 7,878 jobs in the Alexandria area that the plaintiff had the ability to compete for and perform. He stated that Mr. Spangler could return to work as a tool pusher on a land based rig or to another supervisory position. On cross-examination, he stated that he could not point to any specific drilling contractor who would hire the plaintiff given this injury. His conclusion that this man could return to work in the oil field seems to this court to be wholly unsupported by the evidence. Further, he stated on cross-examination that there were 474 supervisory positions available in the Alexandria area at the time of trial but that the plaintiff would be at a competitive disadvantage in obtaining one of these jobs.
One of the plaintiff's physicians stated that plaintiff should not perform any work which required climbing stairs or ladders, heavy lifting or any prolonged sitting. However, considering the other medical evidence and the extent of this man's injury, we cannot say that he is completely disabled from ever engaging in any employment. If plaintiff were to maintain a job at the minimum wage, he would earn over the course of his life expectancy about $158,023 according to plaintiff's expert. Because the plaintiff is not disabled from ever engaging in any gainful employment we will reduce his award by this amount.
Therefore, the judgment of the trial court will be amended to reflect an award for $56,838.91 in lost past wages and $648,994.89 in future lost wages.
Fringe Benefits
Appellant contends that the trial court erred in awarding plaintiff damages for loss of fringe benefits because its economist and rehabilitation expert both testified that plaintiff would be employable in an occupation which would provide similar benefits. Appellant's expert testified that the benefits received by plaintiff were not unusual in that 90% to 95% of all Louisiana workers receive similar benefits. Plaintiff contends that he cannot reasonably compete for positions which would provide him with fringe benefits because of the injuries to his back.
It is not contested that fringe benefits are a legitimate item of recovery in this case, Williams v. Reading & Bates Drilling Co., 750 F.2d 487 (5th Cir.1985).
What is at issue is whether the evidence supports the award. Given our previous discussion on the employability of Mr. Spangler, we do not feel that the trial court erred in disregarding the defendant's expert and accepting plaintiff's expert testimony to the effect that plaintiff could not expect to receive the same fringe benefits he received as an offshore employee. Simply, we do not feel that it is a realistic expectation that the plaintiff can return to similar employment making essentially the same wages and benefits. Therefore, the *682 award of $220,321 for loss of fringe benefits is affirmed.
General Damages
We note at the outset of this discussion that the trial court is given much discretion in an award of general damages, and an appellate court must find that the trial court abused its discretion before an award may be modified. Upon modification, the appellate court is only vested with authority to lower or raise the award to the highest or lowest point which is reasonably within the discretion of the lower court. Coco v. Winston Industries, 341 So.2d 332 (La.1976); See, Harper v. Zapata Offshore Co., 741 F.2d 87 (5th Cir.1984).
Mr. Spangler felt pain in his neck and back immediately after the accident occurred. He thought at first he had pulled a muscle, but as time passed, he sought medical treatment. Subsequently, he underwent an MRI, three myelograms and two back surgeries.
In the first operation, a herniated disc was removed from Mr. Spangler's back at the L-3 level. He continued to experience pain after this operation for an inordinate amount of time and was referred to another physician.
He underwent a second surgery to remove scar tissue that had developed from the first surgery and underwent a spinal fusion at the L-4 and L-5 level and at the L-5 and S-1 level of his spine. Plaintiff had to wear a back brace after this second surgery for several months and was wearing it at the time of trial.
Dr. Rambach, the second surgeon, stated that plaintiff should not perform work which required climbing stairs or ladders, heavy lifting or prolonged sitting.
Plaintiff claims that the accident has strained relations between himself and his wife. He can no longer engage in outdoor activities, such as skiing and other recreational sports. He seems most concerned over the loss of his ability to bend down and pick up his son.
In this case, the trial court awarded $600,000 in general damages. Appellant asserts that the award is an abuse of discretion. We agree.
In Harper v. Zapata Offshore Co., supra, the United States Fifth Circuit stated that $485,000 in damages for pain and suffering was excessive for a seaman who had undergone two separate disk lamenectomies.
Joseph v. Ford Motor Company, 499 So.2d 428 (La.App. 4th Cir.1986) is a case similar factually to this case. In Joseph, the plaintiff had two discs removed and a spinal fusion was recommended. Further, the plaintiff was treated by a psychiatrist for post-traumatic stress disorder. The plaintiff was limited in his ability to work and in his ability to participate in leisure sports activities. His home life was also strained. The Joseph court reduced a $1,700,000 jury award to an award of $350,000.
The Third Circuit affirmed an award of $400,000 in Andrews v. Mosley Well Service, 514 So.2d 491 (La.App. 3d Cir.1987). In Andrews, the plaintiff underwent a back decompression surgery which did not significantly improve his condition. He was diagnosed with a 20% disability. Mr. Andrews underwent 15 days of traction in the hospital following his accident. He wore a back and neck brace for over one year. Andrew's doctor stated that his surgery was more extensive than usual and that the operation did not improve the condition. Mr. Andrews could not return to work and would experience permanent pain. The injuries to Mr. Spangler do not appear be as severe in this case.
Typically, awards between $125,000 to $175,000 are usually allowed in cases where the plaintiff has sustained a back injury and has undergone a single back surgery. This range of recovery is usually associated in cases where the plaintiff has undergone a disc lamenectomy and a fusion of his spine in the same operation. See, Wactor v. Pickens Lumber, 505 So.2d 815 (La.App. 2d Cir.1987) and the cases cited therein. The plaintiff in this case cites no case awarding more than $350,000 for injuries similar to the ones suffered by this plaintiff. See, Johnson v. Dufrene, 433 *683 So.2d 1109 (La.App. 4th Cir.1983), awarding $300,000 in general damages; Thibodaux v. ACME Truck Lines, 443 So.2d 716 (La.App. 5th Cir.1983) awarding $350,000 in general damages and Aucoin v. Hartford Accident & Indemnity Co., 499 So.2d 1042 (La.App. 3d Cir.1986) awarding $150,000 in general damages. Considering that plaintiff underwent three separate myelograms, an MRI and two back surgeries it is apparent that he is entitled to more than the range normally awarded in a back injury involving a single surgery. Given these facts and the testimony in the record concerning his personal life and permanent disability, we find that the highest award that could reasonably be awarded to the plaintiff is $375,000.
Punitive Damages
The most troublesome award of damages in this case is the trial court's award of $5,410,000 in punitive damages. While these damages may not be recoverable pursuant to a Jones Act case, we note that they are available under general maritime law. Because of our holding concerning the unseaworthiness of this vessel, we note that punitive damages are a proper item of recovery in this case. However, we also recognize that the award of punitive damages is a harsh remedy and normally is not favored by law. Creamer v. Porter, 754 F.2d 1311 (5th Cir.1985).
While the plaintiff's burden in proving negligence in this case was only "slight", his burden of establishing that an award of punitive damages is proper is much higher. Awards of punitive damages are proper upon a showing of willful and wanton misconduct by the ship owner. Complaint of Merry Shipping, Inc., 650 F.2d 622 (5th Cir.1981); Bergen v. F/V St. Patrick, 816 F.2d 1345 (9th Cir.1987). It has been held that mere inadvertence or even gross negligence will not suffice to support an award of punitive damages. The shipowner's conduct must be so egregious that it amounts to a wanton and willful disregard for a seaman's rights. Harper v. Zapata Offshore Co., supra. Other courts have characterized conduct manifesting a reckless or callous disregard for the rights of others as the standard for judging whether punitive damages are appropriate. Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); Protectus Alpha Navigation v. North Pacific Grain Growers, 767 F.2d 1379 (9th Cir.1985). In this case, it was shown that the tool pusher and rig engineer aboard the Alaskan Star, along with the drilling superintendent knew that the drawworks brake on the Alaskan Star had kicked people. Some of the people stated that the kick was due to their own error. Yet, others blamed the kicking on defective equipment.
North Star attempted to remedy this kicking by placing a brake equalization kit on the drawworks. However, this action did not solve the problem.
Plaintiff strongly argues that the most damaging evidence is that North Star failed to replace the pins and bushings on the drawworks brake after Mr. Stewart was injured, especially considering that the rig was stacked after this accident and that a manufacturer's bulletin suggested that this problem could cause a drawworks brake to kick. North Star stated that they examined the drawworks brake after this accident and the pins and bushings did not seem to be worn. Although it may have been negligence on the part of North Star to do nothing more than a visual inspection, its conduct did not rise to the level of wantonness or callousness or even gross negligence. Certainly, it did not willfully violate its duty to maintain a seaworthy vessel. The drawworks brake on this rig was inspected every two or three days by visual inspection. With hindsight it would appear that North Star should have torn down the braking system and taken measurements of the wear on the pins and bushings in this braking system. But, this negligence does not support an award of punitive damages. Therefore, the trial court's judgment in this regard will be reversed.
Loss of Consortium, Society and Services
In a general maritime law case, the spouse of a non-fatally injured seaman may recover damages for loss of society. American Export Lines, Inc. v. Alvez, 446 *684 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980); Cruz v. Hendy International Company, 638 F.2d 719 (5th Cir.1981); Gaspard v. Transworld Drilling Company, 468 So.2d 692 (La.App. 3d Cir.1985). Since the defendant is held liable on a claim of unseaworthiness, these damages are recoverable in this case. "Society" includes loss of the love, companionship and affection that a spouse loses as a result of an injury to the other spouse. Gaspard, supra; Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). "Service" is the uncompensated work around the house or educational help with the children which presumably will, as a result of the injury, have to be obtained from another source and at a price. Lonthier v. Northwest Insurance Company, 497 So.2d 774 (La.App. 3d Cir. 1986). In this case, the trial court awarded Ms. Spangler $75,000 for this loss. Considering the evidence in the record, we must reduce this award.
First, there is no evidence that Ms. Spangler stopped loving her husband or that he has stopped loving her as a result of this accident, although this accident has certainly placed a great strain upon the relationship. Secondly, in regard to companionship, it appears that Mr. Spangler will no longer be working offshore for extended periods of time. He will actually be at home more often than he was before the injury. However, the time this couple spends together is not of the same quality as before the accident. Mr. Spangler is more irritable and frustrated because of his injury. He sometimes vents this frustration on his wife and child. There is no doubt that the sex life of this couple has diminished. The testimony is uncontradicted in this regard. Next, we consider services. Mr. Spangler stated that he kept a garden, chopped wood, and performed other chores around the house before the accident. Further, he testified that he was frustrated because he could no longer help entertain his son as he did before the accident. There was no evidence in the record that the Spanglers were forced to hire extra help or any proof of a financial loss. See, Finley v. Bass, supra.
Plaintiff cites Tracy v. Jefferson Parish, 523 So.2d 266 (La.App. 5th Cir.1988), for support of the award for loss of consortium in this case. In Tracy, the husband was severely injured and disabled. The marriage of the couple had deteriorated to the point that the wife of the injured party sought counsel from a psychiatrist. Hopes of having children had faded and the wife was deprived of having a sexual partner. The love and affection between the couple was severely strained. The award was $75,000. The evidence in the instant case does not support as high of an award for consortium. Mr. Spangler's injuries and disability were not as great, nor was Mrs. Spangler's loss as great. Mrs. Spangler did not have to seek counsel from a psychiatrist nor does it appear that she is deprived of a sexual partner although the couple's sex life has diminished.
In Finley v. Bass, supra, we affirmed an award of $5,000 for loss of consortium. In that case, loss of sexual relations and potential loss of services was proven. The injured spouse had suffered with an aggravated back injury. We noted that the award was low but not an abuse of discretion. In Sexton v. Louisiana Vacuum Services, Inc., 506 So.2d 780 (La.App. 1st Cir.1987), the First Circuit affirmed a $10,000 consortium award. In that case, the injured spouse suffered from a variety of injuries including, a cervical and lumbar strain, contusions, fractured scapula, lacerations of the face and fractured teeth. The injured spouse's wife stated that she had to act as a nurse in caring for him. She also testified to a loss of sexual relations and a decline in their social life.
Finally, we reduced a loss of consortium award from $300,000 to $20,000 in Thomas v. State Farm Insurance, 499 So.2d 562 (La.App. 2d Cir.1986). The injured spouse had a lengthy recovery period, personality change and was unable to perform sexually.
Therefore, we find in this case that the highest award in the trial court's discretion was $25,000.

*685 PRE-JUDGMENT INTEREST
Appellant argues and appellee agrees that the trial court erred in awarding pre-judgment interest on future losses. See, Williams v. Reading and Bates Drilling Co., supra. We will, accordingly, amend the judgment to allow pre-judgment interest only on the amount of past losses, although it is not entirely clear whether pre-judgment interest is precluded on future economic losses as well as future non-economic losses. See and compare Williams; Pickle v. International Oilfield Divers, Inc., supra; McFarland v. Justiss Oil Co. Inc. 526 So.2d 1206 (La.App. 3d Cir.1988); and Savoie v. McCall's Boat Rentals Inc., 491 So.2d 94 (La.App. 3d Cir. 1986).
The amount of past economic losses which includes an award of $56,838.91 for past lost wages as reduced on appeal, an award for past lost fringe benefits of $15,559 (that part of the total award of $220,321 for fringe benefits attributed to past lost fringe benefits by plaintiff's expert), and an award for past lost meals of $2,616 amounts to $75,013.91. The amount of past non-economic damages is not so easily calculated because neither the trial court nor this court has attempted to proportion the award between past and future damages. Remand to the trial court for such purpose was ordered in Williams, Pickle, and McFarland. In Savoie, the court found there was no way to quantify a jury's lump sum damage award and it would be an undue burden on the litigants and the court to remand the case. The court reversed the award of pre-judgment interest, and awarded interest on the total award from date of judgment.
Somewhat arbitrarily and in order to finalize the judgment in this case without remand, we apportion the $375,000 general damage award and $25,000 consortium award one-half to past damages and one-half to future damages.
The judgment will be amended to provide for legal interest on Mr. Spangler's past losses in the sum of $262,513.91 and Mrs. Spangler's past losses of $12,500 from date of accident until paid and on Mr. Spangler's future losses in the sum of $1,078,404.89 and Mrs. Spangler's future losses of $12,500 from date of judgment until paid.

DECREE
For the reasons assigned:
1. the award to Mr. Spangler for loss of past wages is reduced from $62,070 to $56,838.91;
2. the award to Mr. Spangler for loss of future wages is reduced from $881,284 to $648,994.89;
3. the award for loss of fringe benefits in the amount of $220,321, apportioned $15,559 for past loss and $204,762 for future loss, and the awards of past lost meals of $2,616 and future lost meals of $37,148, are affirmed;
4. the award to Mr. Spangler for general damages is reduced from $600,000 to $375,000;
5. the award to Mrs. Spangler for loss of consortium, society and services is reduced from $75,000 to $25,000;
6. the award to Mr. Spangler for punitive damages is reversed; and
7. interest on damages for future loss is amended to run from the date of judgment.
Accordingly the judgment is amended and recast to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, WILMER LOYD SPANGLER, JR., and against the defendant, North Star Drilling Company, in the sum of ONE MILLION THREE HUNDRED FORTY THOUSAND NINE HUNDRED EIGHTEEN AND 80/100 ($1,340,918.80) DOLLARS, with legal interest on $262,513.91 from the date of the accident, September 15, 1986 until paid; and legal interest on $1,078,404.89 from date of judgment until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, SHEILA SPANGLER, and against the defendant, North Star Drilling Company, in the sum of TWENTY-FIVE THOUSAND *686 AND NO/100 ($25,000.00) DOLLARS, with legal interest on $12,500 from the date of the accident, September 15, 1986 until paid, and legal interest on $12,500 from date of judgment until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant, North Star Drilling Company, pay the expert witness fee of Mr. George Green, in the amount of THREE THOUSAND SIX HUNDRED FIFTY-NINE AND NO/100 ($3,659.80) DOLLARS and the expert witness fee of Dr. Charles Bettinger in the sum of SIX HUNDRED AND NO/100 ($600.00) DOLLARS.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant, North Star Drilling Company, be cast with all other costs of court, including the cost of appeal.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART AND JUDGMENT RECAST.
NOTES
[1] The Alaskan Star is moveable and capable of self-propulsion.
[2] Appellant directed our attention to the U.S. 5th Circuit granting of a rehearing en banc in the case of Legros v. Panther Services Group, 863 F.2d 345 (5th Cir.1988), which was to consider whether the Robison test should be overruled in favor of a "navigational-function" test. We note that the case has been disposed of by settlement and the appeal dismissed. See, Legros, 874 F.2d 953 (5th Cir.1989). Therefore, Robison is the proper articulation of the law applicable to this case.
[3] We note that the U.S. Bureau of Labor Statistics was accepted by the trial court as the appropriate source of determining work life expectancy. The Camus study offered by the defendant for determining the work life expectancy of an oil field worker was properly rejected.