582 So.2d 1349 (1991)
Jimmie G. MORRIS and Linda Hammons Morris, Plaintiffs-Appellants,
v.
OWENS-ILLINOIS, INC., United Insurance Company and Travis Gartman, Defendants-Appellees.
No. 22222-CA.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1991.
Rehearing Denied July 24, 1991.
*1350 Kelly & Salim by Donald G. Kelly and William L. Townsend, III, Natchitoches, for plaintiffs-appellants.
Cook, Yancey, King & Galloway, by Charles G. Tutt and Kelly W. Strickland, Shreveport, for defendants-appellees.
Before MARVIN, C.J., and HIGHTOWER, VICTORY, BROWN and STEWART, JJ.
MARVIN, Chief Judge.
As mandated by LSA-Const. Art. 5, § 8, when one of the three-judge original panel dissented from a reversal of the trial court judgment, this appeal was reargued before a five-judge panel.
This action arose out of a head injury to a contract truck driver whose head was struck by defendants' loaded forklift. The driver and his wife appeal a judgment based on a jury verdict that found defendants not at fault.
In addition to their complaint that the jury wrongly determined liability, plaintiffs complain of an evidentiary assignment and of the manner in which the court handled the jury selection, instructions, and verdict interrogatories.
The critical issue is whether defendants breached any duty to the truck driver and thereby caused plaintiffs' injuries.
We reverse and render judgment for plaintiffs, finding and allocating fault and assessing damages.

FACTS
Plaintiffs are Mr. and Mrs. Jimmie Morris. He was a truck driver for Davison Transport, who was a contract hauler for Owens-Illinois, Inc. (OI), a manufacturer and wholesaler of cardboard corrugated boxes. Defendants are Owens-Illinois, its liability insurer and Travis Gartman, its *1351 employee. Plaintiffs will be referred to singularly as Morris, except where otherwise appropriate.
During the morning of March 5, 1985, Morris drove his truck, as his employer had directed on OI's order, to OI's Minden, Louisiana, plant to pick up a trailer-load of corrugated boxes and deliver the load to a location in Longview, Tex. Morris had hauled trailers for OI on several occasions before and was familiar with the routine for haulers at the OI plant. He did not know and was not informed, however, that OI had recently changed the forklifts it used to load trailers from butane powered engines to electric powered motors. The electric powered forklifts operate much more quietly than do the butane powered forklifts.
Upon arrival at OI's plant, Morris was told by Gartman, OI's "shipper," or by the OI dispatcher that he could "hook-up" his truck to the Davison trailer that Gartman would be loading at Loading Bay 10 of the OI plant. OI allowed a contract driver to check the trailer he or she was assigned to haul while the trailer was being loaded by the OI shipper. As Morris was completing his hook-up, he heard the movement of the forklift inside the trailer. After checking the lights and the tires on the driver's side of his 18-wheeled tractor-trailer rig, he then moved to the passenger's side of the rig to make a similar check.
The rear of the trailer floor was almost flush with two loading bumpers which projected about 8 to 10 inches from the outside wall at each corner of the OI loading bay opening. The right rear vertical side of the trailer was about 18 inches from the side of the Bay 10 doorway. These photographs depict the relationship between the trailer and the loading bay opening or doorway.

While standing at ground level at the right rear corner of the trailer near the 18" opening to check the right rear lights on the trailer, Morris stuck his head past the right vertical sidewall of the trailer, whereupon the loaded forklift being driven forward into the trailer by Gartman struck and injured him. The impact fractured his jaw and caused other injuries to his face and head.
The load on the forklift was a stack of folded corrugated boxes about 96 inches high and 85 to 90 inches wide. The load extended two to three feet past the forklift on each side and obstructed Gartman's forward vision. After unloading one stack of the boxes in the trailer while Morris was *1352 hooking up, Gartman was driving the loaded forklift into the trailer with a second stack when the accident occurred.
Gartman picked up the stacks from near Loading Bay 5, about 50 feet from Bay 10. After picking up a stack he would then drive forward toward Bay 10, making a sweeping left turn near Bay 9 and stopping to squarely position the forklift for entry into the trailer at Bay 10.
Gartman explained that he would stop the forklift about 10-15 feet from the trailer to align the stack he was carrying for unloading. Looking over the top of the load, Gartman was using the top of the trailer, which he could see, as a "guide" to enter the trailer, being unable, because of the load, to see either to the left or the right of the load. Once he aligned the stack with the top of the trailer Gartman would then drive forward into the trailer to unload the stack. Gartman was not aware that his load had struck Morris until other employees alerted him.
Gartman was wearing earplugs while operating the forklift, a standard operating procedure for shippers at the OI plant. The forklift came equipped with an amber flashing light and a horn, both of which were in working order. The amber light was flashing. Gartman did not, however, sound the forklift horn at any time during the loading process. Gartman explained that he used the horn only in heavily traveled areas where people were working to alert them of the forklift's presence. Gartman said he knew that the interior of the loading dock was restricted and was off limits to contract drivers, but acknowledged that he had not informed Morris which specific areas of OI's plant were restricted. He also acknowledged that he knew Morris was hooking up and checking the trailer while Gartman was loading it.
I don't believe I told him the rules and regulations. He asked me ... if the load was ready and I said I hadn't loaded it yet. And I told him what trailer I was loading and if he had wanted to go back under and hook up and get ready to pull it, that he could while I loaded it. And then so he went outside and he proceeded to do that.
Q. Okay. But at no time during this discussion did you tell him where he had to stand or what he had to do or what might be considered off limits to him at the Owens-Illinois plant, did you?
No, sir, I didn't. He come in and he turned around and went back out.
OI's shipping supervisor testified:
Q. Do you know of any written policy that Owens-Illinois had regarding where drivers could wait while they were being loaded?
A. No, sir.
Both ANSI (American National Standards Institute) and OSHA (Occupational Safety and Health Administration Act) provide minimum safety standards for forklift operation. OSHA is federal law. ANSI compiles and publishes recommendations formulated by the industry. ANSI and OSHA require a forklift operator to maintain a clear view of the path of travel and to slow down and sound the horn of the forklift at locations where vision is obstructed. If the load of the forklift obstructs the operator's forward view, ANSI and OSHA require the forklift operator to obtain a clear view by traveling in reverse with the load trailing. A loaded forklift, of course, must be driven forward into the trailer to properly place its cargo in the trailer.
In verdict interrogatories, the jury answered only the first three of eight interrogatories, concluding that Gartman and OI were not negligent and that the forklift itself did not pose an unreasonable risk of harm to Morris. The interrogatories did not require the jury to answer further whether Morris was negligent or otherwise assess fault and damages.

STANDARD OF REVIEW
Factual issues, cause-in-fact and allocation, if any, of fault, are the prerogative of the jury. These findings will not be disturbed on appeal unless they are found to be clearly wrong, manifestly erroneous. Brownell v. Dietz Motor Lines, 503 So.2d 1069 (La.App.2d Cir.), writ denied, 505 *1353 So.2d 60 (La.1987); Heard v. Bonnie and Clyde's of Hattiesburg, 501 So.2d 1003 (La. App.2d Cir.), writ denied, 503 So.2d 481 (La.1987). Review is not satisfied by reading so much of the record as would reveal a reasonable factual basis for a jury's finding. The record must establish and preponderate that the jury's finding is not clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Jones v. Lingenfelder, 537 So.2d 1275 (La.App.2d Cir.), writ denied, 539 So.2d 631 (La.1989).
Where a jury verdict is found to be clearly wrong, a judgment based on that verdict may be reversed or modified. Lowe v. Continental Ins. Co., 437 So.2d 925 (La. App.2d Cir.), writ denied, 442 So.2d 460 (La. 1983).
Duty questions, including whether a duty extends to protect a particular plaintiff against a particular harm, are essentially legal questions. Finley v. North Assur. Co. of America, 476 So.2d 837 (La. App.2d Cir. 1985).

CAUSE-IN-FACTLEGAL CAUSE
The finding of actionable fault must be premised on the existence of a legal duty and a breach of that duty. Whether a duty is owed by one party to another depends upon the facts and circumstances of the particular case and the relationship of the parties. White v. McCoy, 552 So.2d 649 (La.App.2d Cir.1989).
We must conclude, contrary to the contentions of defendants and its safety expert, that Gartman owed Morris the duty to warn him, by sounding the horn on the forklift, that he was proceeding to drive the load into the trailer. CC Art. 2315 and standards summarized above.
We parenthetically paraphrase the remarks to state the theme of defendant's safety engineer to the jury. Dr. Waymon L. Johnston, defendant's safety engineer, effectively stated to the jury his opinion that it was not necessary (Gartman had no duty) to sound the forklift horn while loading because Dr. Johnston did not consider Bay 10 to be a blind spot and because Gartman, being aware of the restricted nature of the loading area, would not have any perception (reasonable foreseeability or anticipation) that anyone (other than authorized personnel of OI) would be in the area. As a variation on this theme, defendants argue that any failure on Gartman's part was insignificant and that the sole and only cause in fact of the accident was Morris's foolhardiness in sticking his head in front of the loaded forklift. Neither the law nor the record supports these contentions. Gartman was proceeding, deliberately and necessarily blindly, on the forklift toward the trailer. The instrument which collided with Morris's head was the moving load of the forklift being driven by Gartman.
This accident had at least two substantial causes in fact. But for Gartman's conduct in proceeding forward and but for Morris's conduct in putting his head in front of the moving forklift, the accident would not have occurred. We must find that if Gartman had sounded the horn of the forklift while he proceeded, from a stopped position, 10-15 feet forward and blindly into the trailer, Morris would have heard and obeyed the horn. Conversely, we cannot find that if Morris had heard the horn, he would have exposed his head to the loaded and moving forklift. Morris was aware that Gartman was loading the trailer. He had earlier heard and sensed the movement of the forklift and Gartman had told Morris that he would be loading the trailer while Morris was hooking up.
Gartman was aware that Morris was outside the Bay 10 loading dock hooking up and checking the equipment on the trailer that Gartman was in the process of loading. Gartman had expressly suggested that Morris do this. Gartman knew or should have known that the bay opening was not totally covered by the open rear of the trailer, but was partially accessible to Morris or to anyone who might be in the area. The opening of about 18 inches between the right rear vertical side of the trailer and the Bay 10 doorway allowed access.
Gartman's duty was to operate the forklift in a reasonably safe manner, in accord with reasonable safety standards, to protect *1354 against risks which could be reasonably foreseen. See summary of OSHA and ANSI standards, above, and CC Art. 2315.
There are legal or policy reasons which, in some instances, a court may find that will excuse consequences which follow a negligent act. Policy reasons may effectively limit the extension of a duty to protect a particular plaintiff from a particular risk. See Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L. Rev. 1, 15-23 (1973).
Here we find no policy reasons, moral, social, economic, in case law or elsewhere, why the forklift driver's duty of reasonable care should not extend to protect this particular plaintiff from the risk of being struck by the forklift.
Gartman's duty extended to protect even the unauthorized person in the area against his own negligence or foolhardiness. But for the failure of Gartman, this accident would not have occurred. But for the failure of Morris to exercise reasonable care for his own safety, this accident would not have occurred. The failure of each was a substantial cause in fact and a substantial legal cause of this accident. The jury was clearly wrong in concluding otherwise.
Accordingly, we proceed to allocate fault and assess damages, reversing and rendering judgment for plaintiffs.

ALLOCATION OF FAULT
In its interrogatories, the jury did not reach the issue of Morris' negligence. Having determined that the actions of both Gartman and Morris were causal factors in Morris's injuries, we determine a fair and just allocation. See Raymond v. Safeway Stores, Inc. 522 So.2d 1350 (La.App.2d Cir. 1988).
There were no extenuating factors justifying either Gartman's proceeding to load the trailer without exercising reasonable care or Morris's sticking his head past the trailer wall. Morris's conduct created a risk only to himself and not to others. He knew generally that Gartman would be loading the trailer while he hooked up, but inadvertently failed to realize the exact location of the forklift when he stuck his head in front of it. It is not shown or suggested that Morris knew or should have known that the forklift would be proceeding blindly into the trailer.
Gartman's conduct was consciously and deliberately undertaken. He created a risk, not to himself, but to anyone who might inadvertently find himself or herself in front of the loaded moving forklift which was being driven blindly ahead. The capacity of Gartman to avoid the very foreseeable risk that someone, foolhardy or not, would be in front of the forklift was superior to the capacity of Morris. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). Compare Finley v. North Assur. Co. of America, supra.
Considering the Watson factors and mandate, we find Gartman, whose conduct was more consciously and deliberately undertaken and whose capacity to avoid injury to others was greater, was more at fault than was Morris, notwithstanding the jury's finding that neither Gartman nor OI was negligent. Where we find the jury's allocation of 100 percent fault to a plaintiff is clearly wrong, we follow the guideline of Watson, supra, and attempt to justly allocate fault on the basis of the appellate record. CCP Art. 2164; 469 So.2d at p. 973. We determine that a reasonable and just allocation of fault should be 65 percent to Gartman and 35 percent to Morris.

DAMAGES
Similarly, in making an initial award of damages, an appellate court is not limited to either the highest or lowest amount of the reasonable range of awards which would have been affirmed on appeal. Our responsibility is to award an amount which is fair and just for the damages supported by the record. Lee v. Great Southwest Fire Ins. Co., 493 So.2d 789 (La.App.2d Cir.1986).
Following the accident, Morris was transported to Schumpert Medical Center Emergency Room and treated by Dr. Marshall W. Cunningham, plastic and reconstructive *1355 surgeon, who diagnosed complex facial lacerations and a subcondylar jaw fracture. A complex laceration on the left ear was repaired and Morris was hospitalized for observation.
Dr. Cunningham placed arch bars on Morris's upper and lower teeth and wired his mouth shut to stabilize the jaw and allow the fracture to heal. Morris was discharged March 11, 1985, with his lower facial area being thereafter immobilized by the bars and wires for fivesix weeks.
After Morris began experiencing hearing problems in his left ear, he was referred to Dr. Lawrence J. Danna, ear, nose and throat specialist. Dr. Danna examined Morris on March 12, 1985, and diagnosed a bruised external auditory canal, facial nerve paralysis, ruptured left eardrum, and a basilar skull fracture which had damaged the inner ear's hearing and balance functions. Blood had accumulated behind the left eardrum, and the damaged inner ear caused disequilibrium (balance problems) and positional vertigo (dizziness). Morris also suffered from tinnitus (constant roaring) in his left ear.
The positional vertigo attacks were sporadic but severe, occurring on rapid head movement and often producing a feeling of nausea. After two or three weeks, the blood behind the left eardrum had drained and the eardrum showed healing scarring.
Dr. Priscilla Perry, ophthalmologist, examined Morris on March 14, 1985, on referral from Dr. Danna. Because of his left facial paralysis, resulting in excessive tearing and pain radiating from above the left eye, around the left ear and down the neck, Morris could not close his left eyelid.
By mid-April 1985, the facial paralysis had essentially resolved except for decreased sensation and slight muscle weakness on the left side of the face.
After general anesthesia and the removal of the wire and the bars which had immobilized his jaws, Morris was examined by Dr. E.D. Coates, Jr., dentist, for malocclusion and two chipped teeth. The occlusion was adjusted by grinding the upper right first and second molars. The chipped teeth were repaired with bonding material.
On referral by Dr. Danna, Morris was examined by Dr. Gale Gardner, otologist or hearing specialist, February 7, 1986. Dr. Gardner diagnosed Morris as suffering from a 50 percent hearing loss in the left ear. The damaged left inner ear continued to cause disequilibrium and positional vertigo. Morris also continued to suffer from tinnitus which affected his ability to concentrate.
The damaged inner ear also caused speech discrimination problems, making it difficult for Morris, in the presence of background noise, to understand meaning and determine the direction where sounds were coming from.
Dr. Gardner said Morris's hearing loss was "substantial." Although noting that Morris has some useful hearing in his left ear, Dr. Gardner concluded that the hearing loss has rendered Morris relatively deaf in the one ear. The hearing loss, positional vertigo, disequilibrium and tinnitus are permanent.
Morris's past medical expenses were stipulated at $10,369.86. Testimony revealed that Morris was receiving medical treatment at the time of trial from Dr. Danna for his hearing problems and would continue to do so. The teeth that were chipped will need to be touched up, repaired or replaced every several years. We do not have estimates of the cost of future medical expense in this record. Our award for future medical expenses shall therefore be nominal for the 44-year-old plaintiff.
Morris's activities are curtailed because of his permanent disabilities. He is no longer able to hunt or to fully participate in his children's activities. The tinnitus affects Morris's ability to sleep and to concentrate. His hearing impairment causes him to feel inadequate.
In July or August, 1985, Morris returned to work part-time at Davison in the office, answering phones and running errands. Morris maintained part-time status for several months because his disequilibrium and vertigo rapidly fatigued him. After beginning computer training at Davison in 1985, *1356 Morris became a dispatcher for Davison in April 1987. Dr. Danna advised Morris that he should no longer work as a truck driver because of his hearing loss, disequilibrium and vertigo. Working clerically and later as a dispatcher, Morris's earnings have not and will not equal the earnings of a truck driver.
Opinion testimony by experts for the defense and for plaintiffs essentially agreed that Morris's gross lost past earnings totalled $47,349 and the discounted value of lost future earnings would be approximately $90,000. We shall award these amounts.
Morris's wife, Linda, seeks damages for the loss of consortium under CC Art. 2315. Loss of consortium contemplates something more than a loss of general overall happiness, but includes seven components: love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity. Finley v. Bass, 478 So.2d 608 (La.App.2d Cir. 1985).
Mrs. Morris testified that her husband's injuries have produced in him feelings of inadequacies that have greatly strained their relationship and that almost led to separation and ultimately required them to undergo marriage counseling. Their lifestyle has changed because of Morris's hearing problems affect his ability to cope with crowds and noises. They only rarely attend social functions or public gatherings together, even when their children are involved.
When the accident occurred, Mr. and Mrs. Morris had three children in high school, two of which participated in sports. Mrs. Morris now attends a few social, school, and other functions alone, but not as many as she otherwise would, because she is aware of her husband's fear and discomfort when he is left alone, even in their home. He becomes frightened or disturbed and feels helpless because of his inability to determine the location of sounds in the home. Their sexual relationship was nonexistent while Morris's jaws were wired and has since been affected by his permanent injuries. She is entitled to damages for loss of consortium.
In view of our disposition of this appeal we do not consider plaintiffs' additional assignments of error. Subject to the fault allocation, we render judgment assessing plaintiffs' damages in these amounts:

Morris: past medical expenses .....$10,369.86
 future medical expenses ....$2,000.00
 general damages ..........$200,000.00
 loss of earnings,
 past and future ........$137,349.00
 -----------
 TOTAL ....................$349,718.86
Mrs. Morris: loss of consortium ...$60,000.00

DECREE
For reasons above assigned, the judgment of the trial court absolving Gartman, OI, and OI's liability insurer from liability is reversed and judgment is rendered as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiffs, Linda and Jimmie Morris, and against the defendants, Travis Gartman, Owens-Illinois and United Insurance Co. in the proportion of 65 percent for Jimmie Morris's total recoverable losses of $349,718.86 and for Linda Morris's recoverable losses of $60,000, plus legal interest from date of judicial demand.
Appellees, Gartman, OI, and United Insurance Company are assessed with costs, including expert witness fees, as they may be stipulated or fixed by rule in the trial court. The case is remanded for that purpose.
REVERSED, RENDERED, AND REMANDED.
BROWN, J., concurs with reasons.
HIGHTOWER and VICTORY, JJ., dissent with written reasons.
BROWN, Judge, concurring.
Although I would prefer to find defendants at least 80 percent at fault, I concur in this opinion. Defendant's employees told plaintiff he could "hook-up" the trailer while it was being loaded. The foreseeable response by plaintiff was to inspect the connections, tires, brakes, and lights including those at the rear of the trailer.
*1357 Plaintiff looked in the building and saw "just stacks of different sized corrugated boxes." He briefly leaned inside to check the rear turn signal when he was struck by the forklift.
Defendant's employees plainly disregarded OSHA and ANSI minimum safety standards by operating the forklift blindly in a forward position and in not sounding the horn. Either by operating the forklift backwards with its amber light flashing directly into the trailer, rather than being hidden behind the load, or by sounding a warning from its horn would have prevented this accident. The purpose of these standards was to warn those on the workplace premises and they were adopted to protect even slightly negligent workers.
Under these circumstances defendants clearly breached their duty to plaintiff and should have been found liable. The interrogatories given to the jury did not present the case in the proper manner and thereby aided in a jury verdict that was clearly wrong. Toups v. Sears, Roebuck and Company, Inc., 507 So.2d 809 (La.1987).
HIGHTOWER, Judge, dissenting.
I must respectfully dissent.
The right to a jury trial is fundamental.
After hearing four days of testimony and being charged as to the duty owed to the plaintiff, this jury found no injury-causing negligence by the forklift operator. Yet, on appeal, the majority disregards that determination and, after conducting essentially a de nova review, proceeds to reach its own conclusions as to what actions would have avoided the accident, notwithstanding that even the factor of timing could have been important under these facts.
Where reasonableness of conduct is the issue, the determination of fault is factual. Dawson v. Clark, 564 So.2d 1291 (La. App.2d Cir.1990). Only where the record reflects that the jury's conclusions of fact are clearly contrary to the evidence, or reveals an erroneous application of law, should a verdict be reversed. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La. 1990); Dawson, supra. Indeed, jury findings should be affirmed unless characterized by manifest error, and should not be upset except in the most compelling and clearest case of error. Dawson, supra; Ritchie v. S.S. Kresge Co., Inc., 505 So.2d 831 (La.App.2d Cir.), writ denied, 507 So.2d 227 (La.1987).
In the instant case, expert testimony varied greatly. Waymon Johnston, an accepted expert, stated that the operator breached no "duty" by omitting the sounding of the forklift horn under the circumstances involved.
Given the events shown, I conclude the evidence preponderates in support of the jury's verdict. Quite obviously, that verdict is not manifestly erroneous. Contrary to the majority's position, I would accordingly affirm.
VICTORY, Judge, dissenting.
I agree with the dissenting opinion of Judge Hightower and write to give additional reasons.
Plaintiff, an 18 wheel truck driver for many years, stuck his head into an opening between the trailer and the loading dock, when he had actual knowledge the trailer was being loaded by a forklift. Immediately prior to being hit in the head by the load being carried into the trailer by the forklift, plaintiff looked into the opening, failed to see the forklift, the load, the rotating flashing amber light on top of the forklift, or its reflection.
The majority opinion overturns a jury verdict for the defendants, holding that the forklift operator is mostly responsible for the accident due to his failure to honk his horn before entering the trailer with each load.
The sound of a horn is a warning. Prior to starting to load the trailer, the forklift operator told plaintiff he was beginning to load the trailer. Shortly thereafter, plaintiff heard the forklift loading the trailer. In spite of these obvious warnings, plaintiff nonetheless chose to place himself in a position of known danger. Realizing the danger in advance, plaintiff looked inside the dock area and failed to see the forklift, *1358 the load, and the rotating light on the forklift.
There is no duty to warn when the danger is just as obvious to the plaintiff as to the defendant. Here, the danger was more obvious to the plaintiff than to the forklift operator, who could have reasonably expected the plaintiff to keep his head out of the way of a known danger, or to have seen the forklift and its load when he looked.
The defendants' expert told the jury neither the ANSI standards nor OSHA regulations require a forklift operator to honk his horn as he enters a trailer he is loading. He stated such a requirement would be unreasonable. Although plaintiffs' experts were of the opposite opinion, it is the jury's function to determine the credibility of the witnesses, including experts, and the weight to be given their opinions.

APPLICATION FOR REHEARING
Before MARVIN, C.J., and HIGHTOWER, VICTORY, BROWN and STEWART, JJ.
Rehearing denied.