609 So.2d 1134 (1992)
Donnie BOLTON, et ux., Plaintiffs-Appellees,
v.
Ratnam NAGALLA, M.D., Defendants-Appellants.
No. 24,242-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1992.
Rehearing Denied January 14, 1993.
*1135 Lunn, Irion, Johnson, Salley & Carlisle by James B. Gardner, Shreveport, for appellants, Ratnam Nagalla and LA Patient's Compensation Fund.
Craven, Scott & Randow by Samuel H. Craven, Alexandria, for appellees, Donnie and Carrie Bolton.
Before MARVIN, SEXTON and LINDSAY, JJ.
MARVIN, Chief Judge.
In this medical malpractice action the Louisiana Patient's Compensation Fund appeals a judgment awarding the plaintiff husband and wife a total of $480,000 before crediting the $100,000 amount for which the defendant doctor is liable under the law.
We amend to reduce the award for the husband's lost earnings and to delete the award for his lost earning capacity and the award to the wife for her medical expenses. In all other respects, we affirm.

PROCEDURAL POSTURE
Donnie and Carrie Bolton sued Dr. Ratnam Nagalla, her malpractice insurer, and the Louisiana Patient's Compensation Fund. They assert that Donnie Bolton suffered inner ear damage from Dr. Nagalla's negligent administration of Garamycin, an antibiotic, to him while he was hospitalized for treatment of severe stomach pain in October 1983. Bolton's injuries, which are permanent, include a partial loss of hearing in each ear, positional vertigo or dizziness, and tinnitus, a constant ringing or roaring in his ears.
Before trial, the Boltons settled with Dr. Nagalla's insurer, reserving their rights against Dr. Nagalla and the Fund. While agreeing that Dr. Nagalla breached the applicable standard of care in administering the Garamycin to Bolton, the Fund contested whether that conduct caused Bolton's ear problems and contested the measure of damages in excess of $100,000, the statutory limit of Dr. Nagalla's base liability under LRS 40:1299.42.
The Boltons were awarded judgment against the Fund for about $480,000 in damages, subject to the credit of $100,000 because of plaintiffs' settlement with Dr. Nagalla's insurer. Dr. Nagalla was not named in the judgment and is represented on appeal "in name only" by the attorney for the Fund.
The awards to Donnie Bolton, totaling about $430,000, include $200,000 in general damages, $42,797 in past lost earnings and $184,421 for loss of earning capacity. Carrie Bolton was awarded $50,000 for loss of consortium and $617 in medical expenses for treatment of her depression, which began after her husband was injured.
The Fund's appeal primarily challenges the amount of the damage awards. The Fund also claims that Bolton's partial hearing loss in each ear was not caused by Garamycin, but by his cumulative exposure over many years to loud noises while working as a welder before 1983. The Fund now concedes that Garamycin caused Bolton's tinnitus and vertigo.
The trial court's finding on the cause of Bolton's partial hearing loss, a factual issue, is not clearly wrong. The general damage and loss of consortium awards are not excessive. Plaintiffs effectively concede *1136 Mrs. Bolton's medical expenses are not legally recoverable. We reduce the award for Mr. Bolton's past lost earnings from $42,797 to $2,312. His award for loss of earning capacity is simply not supported by the evidence in this record and is deleted.

FACTS
The Boltons live in Atlanta, about 20 miles from Winnfield. On October 8, 1983, Donnie Bolton, age 40, went to the emergency room of the Humana Hospital in Winnfield complaining of severe stomach pain. Dr. Nagalla, who was on duty in the emergency room, admitted Bolton to the hospital that day. She discharged him on October 10 and readmitted him on October 15 for about a week. During both hospital stays, and on Dr. Nagalla's orders, Bolton was given intravenous doses of the drug Garamycin, an antibiotic whose known potential side effects include inner ear damage.
When Bolton left the hospital the second time, on October 21, 1983, he had nausea, dizziness and ringing in his ears. The nausea went away but the ear problems did not. Bolton sought treatment from several doctors, including Dr. Nagalla, who sent him to Dr. Jack Pou, an ear, nose and throat specialist in Shreveport.
From tests done in 1984, Dr. Pou found that Bolton had a hearing loss in the high-frequency range in both ears, tinnitus (ringing or roaring) in both ears, and positional vertigo or dizziness resulting from damage to the balance mechanism in his left ear. According to Dr. Pou, these conditions are permanent and are not treatable medically or surgically.
In 1988 Dr. Pou's assessment was confirmed by additional testing of Bolton by two other doctors: Dr. Charles Neal, a Ruston ENT specialist, and Dr. Jack Vernon, an experimental psychologist in Portland, Oregon, a nationally recognized specialist in the study and treatment of tinnitus.
These three doctors testified by deposition. They agreed that inner ear damage is a well-known potential side effect of Garamycin. Dr. Pou attributed Bolton's vertigo to the Garamycin but opined that his high-frequency hearing loss and tinnitus were probably caused by his having worked around loud noises and equipment in his 20-year career as a welder, which Bolton reported in the history he gave Dr. Pou.
Dr. Neal was aware of Bolton's history of noise exposure and said it could account for some of Bolton's hearing loss and for his tinnitus. Dr. Neal concluded, however, that those problems as well as the vertigo were caused by the Garamycin because Bolton had no history of vertigo or tinnitus before 1983 and the extent of his pre-1983 hearing loss, if any, had never been objectively measured.
Dr. Vernon agreed that noise exposure can cause both a high-frequency hearing loss and tinnitus, but said that about 85 percent of his patients who have a hearing loss and tinnitus caused by noise exposure exhibit some degree of "residual inhibition," meaning that the tinnitus temporarily subsides, for a period of minutes, hours or even weeks, when the patient is exposed to a low-level masking sound. According to Dr. Vernon, Bolton's residual inhibition was "almost nothing ... one or two seconds at best in one ear only," and no relief in the other ear. Dr. Vernon said this "would tend to mitigate or negate the theory of a noise-induced hearing loss or tinnitus."
The high-frequency hearing loss causes Bolton to have difficulty hearing speech when other noises are present, such as when he is in a crowd or near several people who are conversing.
Tinnitus produces constant screeching or a shrill tone in Bolton's ears. The pitch of the tone is generally about 8,000 hertz, which is an octave higher than the pitch of the highest note on a piano. The tone goes up and down in intensity or volume but is always present. Tinnitus worsens when Bolton becomes worried, stressful or is near several people who are talking at once. It interferes with Bolton's concentration and his sleep. Bolton goes to bed before 9:00 p.m., while background noises *1137 in his home mask the tinnitus. He often awakens during the night and experiences difficulty in going back to sleep and fatigue the next day.
Dr. Vernon said there are no effective medical or surgical treatments for Bolton's tinnitus. Dr. Vernon prescribed a "masking device," which emits a constant low-level sound that is intended to mask or cover the tinnitus, but explained that the device is helpful only when the masking sound totally covers the sound of the patient's tinnitus without itself being annoying. In Bolton's case, even the loudest sound of the masking device did not completely mask the tinnitus in Bolton's right ear. Bolton wore the device only briefly, finding it as annoying as the sound he hears without it.
Bolton gave this description of the vertigo: "Any rapid movement of my head or body and you ... lose your balance. It is just like getting your feet knocked out from under you. You have got no control over it." Bolton walks with an uneven gait that some witnesses described as a "shuffle" and has to "pre-plan" his body movements to maintain his balance. He still drives but cannot turn his head quickly without having a dizzy spell.
At trial in 1991, Bolton denied having any hearing loss, tinnitus or vertigo before his 1983 hospitalization. His wife and others who knew him before 1983 testified that Bolton did not complain or show signs of any problems with his hearing before his hospitalization.
Before he was injured, Bolton was a "contract welder" who owned his own equipment and worked on a "per job" basis, mostly on offshore drilling rigs and boats. He sometimes earned $17 per hour and worked for 15 hours a day, seven days a week, in one- or two-week intervals, followed by a week off. Bolton worked about 6-8 months a year. Bolton enjoyed both his work and his weeks off, during which he engaged in various recreational activities with his family and friends.
Having problems keeping his balance, Bolton realized he could not return to work offshore, where he worked at various heights up to 150 feet above the drilling rig platforms. Bolton's doctors agreed that he could not return to work offshore. In late 1983, Bolton began working for a local sawmill, first as a carpenter for a few months, and then as a maintenance welder, the position he still held at trial in 1991. Bolton now makes $9.50 per hour and works 40-50 hours per week, 50 weeks a year. The maintenance work is not as interesting or as challenging as the offshore work, which involved construction welding, according to Bolton. He earns more spendable income, however, as a maintenance welder because he works more hours each year.
Even though Bolton now works on level surfaces, he has to "pre-plan" his movements when he stands, squats or steps up or down at work. His foreman, Frank Hoffman, has seen Bolton frequently stumble and sometimes fall to the ground at work, with no obstacles in his path, when Bolton changes his body position. Hoffman was initially unaware that Bolton had vertigo. He thought Bolton was just "awful clumsy." Hoffman became Bolton's close friend after he learned about Bolton's vertigo and ear problems. According to Hoffman, Bolton does excellent work, much better than most sawmill welders, notwithstanding the vertigo.
Bolton and his wife married in 1964, almost 20 years before Mr. Bolton's injury. They had two children who were ages 17 and 10 when he was injured in 1983. Bolton fished, hunted and played ball with his children when not working offshore. He stopped these activities after he was injured. He also ceased attending his daughter's softball games and did not attend football games because of the crowd noise when she became a cheerleader.
At trial, Bolton's son, Scott, 25 years old, had been working as a contract welder for three years, often out of state. Before his injury, Bolton planned that he and Scott would eventually work together as contract construction welders. Bolton is now limited to maintenance welding at home.
The Boltons no longer socialize with family and friends because of Bolton's sensitivity *1138 to noisy groups. Bolton does not seem to enjoy the few social outings he takes with his family and limited friends. He spends most of his time either at work, sitting in a chair at home, or occasionally working in his yard. He drinks more alcohol than before, sometimes to excess.
The Boltons testified they previously had a satisfying sexual relationship but have not had intercourse since 1985 because, according to Mr. Bolton, "with all the head noise and the vertigo it just got to where I could not. I couldn't perform." They now occupy separate bedrooms.
Bolton was formerly energetic, cheerful and outgoing but has become sullen and has withdrawn from his friends and family because he cannot do things he could do before and he feels no one understands what he is going through. His wife, children and friends testified that he "is not the same person" he was before and has become "a hermit, drawn up in his shell."
Bolton testified that after the injury he "could no longer communicate with [his children or help] them settle disputes [or] problems in school.... I could not get directly involved in it [because of the stress]. I had to more or less let their mother take care of it.... [That] just destroyed the parent image I was supposed to have." His relationship with his wife became strained because he "had [injuries] that she couldn't see and it is very hard to explain and describe to anyone else. It was several years before she finally realized" why his behavior had changed. During this time, Bolton felt that his wife did not care about or support him, explaining that one in his condition is "... struggling on your own and you have no help."
Mrs. Bolton acknowledged she did not initially understand her husband's difficulties. Only with the help of his doctors, she later came to understand the magnitude of his problems and their effect on him, physically and mentally. She said before that time she resented his withdrawal from family activities and discussions.
Mrs. Bolton said she and her husband formerly dealt with family matters as a couple. After her husband's injury, she stopped discussing family matters with him because "he just can't deal with it any more ... He does no more than he has to do.... He is not able to go the extra mile.... A lot of times he just deals with it by going off to himself." She is aware that stress makes his tinnitus worse. These additional burdens sometimes make it difficult for her to concentrate on her work as the food service manager at the local high school, according to a longtime co-worker.
Both Mr. and Mrs. Bolton have undergone psychological counseling intermittently since 1988, attempting to better adjust to the changes in their lives. Their psychologist, Dr. Daniel Lonowski, testified that both suffer from depression and anxiety, and that Mr. Bolton has withdrawn himself from his family and friends because the chronic nature of his injuries has gradually eroded his self-esteem. Mrs. Bolton has had recurring migraine headaches and takes prescribed antidepressant medication. Dr. Lonowski found some slight improvement in the Boltons when they were attending counseling but concluded their overall psychological status was worse in 1991 than it was when he first saw them in 1988.
Dr. Lonowski gave this description of the Boltons' marital relationship in 1991:
Q. What are their prospects in your opinion [for] staying together as husband and wife?
A.... I would say they are going to stay together but they are going to be miserable. They are not enjoying it at this point. They are not enjoying a marital relationship.... it doesn't have the quality at all that one would like to see in any relationship.
Q. You are not talking just solely of the lack of sexual activity in any marriage, but a lack of communication. A lack of tenderness and a lack of interaction?
A. I think there is tenderness on her part and withdrawal on his part with [her] attempts to be tender.... they are basically just holding on to each other... and they are not able to extend themselves as any kind of support base. That *1139 is why ... many people stay married ... because they recognize that whatever the quality a person has that there is some degree of support there for the spouse.
Dr. David Glass, an experimental psychologist in New York, testified by deposition about the psychological effects of noise-induced stress. According to Dr. Glass, exposure to noise which is unpredictable in its intensity and cannot be controlled or avoided, depletes a person's energy, both physically and mentally, making that person intolerant of even minor frustrations at home or at work even after the noise abates. The uncontrollability of the noise often induces feelings of helplessness, anxiety, depression, and a loss of interest in people and activities. Dr. Glass considers severe and constant tinnitus, such as Bolton has, to be a classic example of unpredictable and uncontrollable noise.
According to Dr. Glass, persons suffering from noise-induced stress cope with it in a variety of ways. Some use rational problem-solving: they identify the problem openly and take steps available to them to solve it. Some use psychological defenses such as denial or rationalization, or abuse substances such as drugs or alcohol, which provide only temporary relief but are not effective coping strategies in the long run. Some try to distract their attention from the effects of the stress by engaging in recreational activities.
Because Bolton's injuries are permanent and are not medically treatable, he cannot cope with his psychological stress by rational problem-solving. The injuries prevent him from engaging in the recreational activities he formerly enjoyed. His method of coping, according to Dr. Lonowski, has been to use alcohol excessively.
Mr. Bolton said the injury has been totally devastating to what I considered a normal life. It has almost destroyed every aspect of what I considered normal.... It really tests your sanity at times....
I function just at the bare basics. I still want to be a productive person. You know by having a job. I get out in the yard.... I still drive [but] I had to adjust my driving habits to vertigo.... I still want to maintain some similarity of being a productive person.
Q. What do you think would happen to you if you didn't have that attitude?
I would probably become extremely depressed, just give up the will.

GENERAL DAMAGES
The Fund concedes that Bolton suffered a serious injury but claims the highest amount that the trial court could have reasonably awarded is $100,000. The Fund contends that $200,000 general damage award is excessive because there was evidence that his high-frequency hearing loss was caused by his prolonged exposure to loud noises in his work before 1983. The Fund emphasizes that he now works near his home and sees his family every day, whereas before the injury he was often away from home for a week or more at a time when he worked offshore. The Fund suggests that the extent of his interaction with his children would probably have declined simply as they grew older.
After hearing conflicting expert testimony from Dr. Pou on the one hand, and Drs. Neal and Vernon on the other, about the cause of Bolton's partial hearing loss, the trial court resolved the issue in Bolton's favor. The court expressly found credible the testimony of the Boltons and other witnesses who said Mr. Bolton had no hearing problems before his 1983 hospitalization. On this record, the court's factual conclusion of cause-in-fact is not clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Bonner v. Watkins Motor Lines, Inc., 494 So.2d 1363 (La.App.2d Cir. 1986).
In our review of general damage awards for excessiveness, the threshold inquiry is whether the trial court's award for the particular injuries and their effects upon this particular plaintiff is a clear abuse of discretion, for reasons that can be articulated from the facts in the appellate record. Prior awards may be considered only to determine whether the present *1140 award is greatly disproportionate to the mass of prior awards for truly similar injuries. Reck v. Stevens, 373 So.2d 498 (La. 1979).
The evidence in this record, both lay and expert, amply supports the trial court's finding that Bolton's injuries have devastated his life, physically and psychologically. Bolton's present work is not as challenging or as satisfying as his former work. But for his injuries, he would be considered overqualified for his present work. He now works about 50 weeks a year instead of having a week or two off every month, as before. He is required to compensate for his vertigo in his movements at work and elsewhere.
Bolton's hearing loss manifests itself when he is in a noisy setting, which also aggravates his tinnitus. The tinnitus is both a source of stress and is a condition that is aggravated by the stresses of everyday life.
Bolton's depression and withdrawal from his family and friends represent dramatic changes in his personality and behavior and are considered common reactions to stress induced by uncontrollable noise. He is unable to engage in the recreational activities he formerly enjoyed. He and his wife have not had sex since 1985 and no longer communicate well or support each other emotionally. All of these burdens that befell Bolton in his early 40's are deemed to be permanent by the experts.
Although Bolton's physical presence at home has increased since he was injured, his emotional presence and his ability to enjoy the company of his wife and children have greatly declined. Bolton said he felt frustrated by his inability to actively participate with his wife in making decisions and resolving conflicts at home. He expressed disappointment at not being able to work with his son.
The Fund emphasizes that Bolton did not have a traumatic physical injury, as did the plaintiff in Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.1991), JJ. Hightower and Victory dissenting, writ denied. Morris suffered from permanent tinnitus, positional vertigo and disequilibrium (balance problems), and lost most of the hearing in his left ear, after he was struck in the head by a loaded forklift. Morris was hospitalized with a broken jaw, which was surgically repaired, and had complex facial lacerations and facial nerve paralysis. These injuries, while obviously quite painful, healed within six to eight weeks. This court reversed the lower court on the liability issue and awarded Morris $200,000 in general damages.
Here, we are not determining, as in Morris, an initial "fair and just" general damage award. We are reviewing the award made by trial court which requires us to apply a different standard. We do not reduce an award made by a trier of fact unless we find and can articulate, from the facts in the record, why the award is abusively high. Reck v. Stevens, supra. While the $200,000 award may arguably fall in the upper range of the trial court's discretion, we do not find it to be excessive, notwithstanding the lack of traumatic physical injury, considering the detailed evidence that was presented about Bolton's injuries and their effect on virtually every aspect of his life.

LOSS OF CONSORTIUM
Again emphasizing that Bolton now spends more time at home than he did before he was injured, the Fund contends $50,000 is excessive for Mrs. Bolton's loss of consortium. The Fund asks that we reduce the award to $30,000, one-half the $60,000 loss of consortium award in Morris, supra. The Morrises also experienced great strain in their marriage, for which they sought counseling, and a decline in their social activities and sexual relations because of Morris's hearing-related injuries and resulting feelings of helplessness and inadequacy, which persisted long after his visible injuries healed.
For the same reasons noted above, we do not disturb the trial court's award to Mrs. Bolton. She suffers from clinical depression as a result of the changes in her life resulting from Mr. Bolton's injuries. Mrs. Bolton has permanently lost her conjugal *1141 partner, as an active social companion and as a source of emotional support. The amount of daily stress in her life has increased because she now handles alone many family matters that were once handled by her and her husband. The additional stress on Mrs. Bolton sometimes causes her migraine headaches and interferes with her ability to concentrate at work. Even though her husband, post-injury, spends many more hours per year with her than before, the Boltons vividly detailed why their more lengthy time together is not quality time as before.
On this record, we cannot agree that $50,000 is an excessive award for Mrs. Bolton's loss of consortium.

LOST EARNINGS AND EARNING CAPACITY
The trial court's awards of $42,797 for Bolton's lost earnings through the time of trial and $184,421 for his lost earning capacity in the future are based on the testimony of Bolton's economic expert, Dr. Jan Duggar, an associate professor of finance at the University of Southwestern Louisiana in Lafayette. The Fund contends the award for past losses is excessive and should be reduced to $2,312, the amount calculated by defendant's expert, Dan Cliffe, a New Orleans CPA-MBA. The Fund argues there is no factual basis for an award for loss of earning capacity because Bolton has earned more after he was injured than he did before.

Past Losses
Bolton testified that his pre-injury gross earnings averaged $1,000 per week and that he worked for an average of seven or eight months, or 30-35 weeks, per year. Bolton worked for Max Welders, Inc., as an independent contractor, and deducted his business expenses, such as equipment depreciation and room and board, from his gross income on Schedule C of his federal income tax returns, which were introduced in evidence. We refer to his income before deduction of expenses as his "gross income" and his income after deduction of expenses but before taxes as his "adjusted gross income," realizing that the technically correct term for the latter amount on Schedule C is "net profit from business."
In 1981, Bolton grossed $36,682 for 41 weeks of work. He deducted 64 percent of his gross income, or $23,332, for his business expenses, leaving an adjusted gross income of $13,350.
Bolton worked for 22 weeks in 1982, grossing $21,380 and deducting $19,458, or about 90 percent of his gross income, for an adjusted gross income of $1,922.
Before his injury in October 1983, Bolton had worked for 12 weeks, according to his tax returns. His adjusted gross income was only $358, as he deducted almost 100 percent of his gross income ($14,596) in expenses ($14,238).
Bolton began working for his current employer, L.L. Brewton Lumber Co., Inc., in late 1983. He earned wages of $222 at the end of 1983 and $7,666 for part of 1984. The rest of his 1984 income from L.L. Brewton was reported on Schedule C: $23,223 gross income, $4,589 expenses, $18,634 adjusted gross income.
Bolton has been paid wages as an employee and, since 1985, has not reported any income on Schedule C. His gross earnings before taxes have increased each year, from about $23,000 in 1985 to about $29,000 in 1990.
In calculating Bolton's lost earnings through trial (October 1983-March 1991), Dr. Duggar did not compare Bolton's actual earnings before his injury with his post-injury earnings. Instead, Dr. Duggar estimated Bolton's earning potential before his injury, based on the actual gross earnings of Furman Wages, a former co-worker of Bolton's, who continued to work as a contract welder after 1983, less 20 percent for his expenses, and compared this with Bolton's actual earnings to arrive at $42,797 as the value of Bolton's past losses. This comparison, and resulting conclusion, is not factually supported. LCE Art. 705.
Bolton's former co-worker, Furman Wages, did not testify at trial. Bolton testified that Wages lives in Picayune, Mississippi, and had declined to testify because of *1142 his work and personal reasons. Bolton said Wages worked with him on about 95 percent of the jobs he worked before he was injured and earned "the same type of pay" that Bolton earned. Bolton's hourly rate of pay was $17-18 until some unspecified time in 1983, when it was reduced to $14.
Dr. Duggar did not interview Mr. Wages but simply used the information about his gross earnings for each year, 1985-1989, that was furnished him by Bolton's attorney. Dr. Duggar said the information came from Max Welders, Inc., the employer of Bolton and Wages. The information that Bolton's attorney provided to Dr. Duggar was not attached to his deposition or placed in evidence other than through Dr. Duggar's testimony. Dr. Duggar was not given Mr. Wages' tax returns.
Mr. Wages' gross earnings from 1985-1989 ranged from $35,000-55,000 per year. Dr. Duggar did not know how many weeks per year Wages worked, or how much he deducted from his gross income for his business expenses.
The Fund argues on appeal that the trial court should not have accepted Dr. Duggar's testimony because the information about Mr. Wages' earnings was hearsay. The Fund did not make the hearsay objection in the trial court when the deposition was introduced in evidence at trial. The Fund's argument of hearsay comes too late. Taunton v. Cane Air, Inc., 405 So.2d 624 (La.App. 3d Cir.1981).
We agree that an award for loss of past earnings need not be limited to the difference between the plaintiff's actual earnings before and after the injury, but may be based on the difference between the plaintiff's past earning capacity without the injury and his actual post-injury earnings. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Spangler v. North Star Drilling Co., 552 So.2d 673 (La.App. 2d Cir.1989).
In accepting Dr. Duggar's testimony, the trial court implicitly found that Bolton, but for his injury, could have earned as much as Wages earned after 1983, even though he actually earned substantially less than his asserted potential before he was injured. We consider this finding only for discussion purposes, neither agreeing nor disagreeing. We nevertheless conclude that Dr. Duggar's opinion of Bolton's past economic loss is factually unfounded and unsupported for these reasons.
Dr. Duggar used an expense figure of 20 percent of gross income in his calculations. This figure is simply not realistic in the light of Bolton's expenses from 1981-1983. Bolton's expenses ranged from 64 to almost 100 percent of his gross income, according to his tax returns. Dr. Duggar was not furnished with the amount or percentage of Mr. Wages' business expense deductions in the years for which his gross earnings were considered.
Dr. Duggar arrived at the figure of 20 percent for Bolton's expenses by deducting from Bolton's reported expenses those items that Dr. Duggar opined were "soft expenses" that inured to Bolton's benefit, such as depreciation and room and board. According to Dr. Duggar, "soft expenses" are legitimately deductible for tax purposes but are not out-of-pocket expenses and could fairly be considered as part of the income that Bolton had to spend, as a practical matter. There is no factual support in the record for this opinion, which was strongly controverted by the Fund's expert.
On further questioning, Dr. Duggar testified that Bolton's pre-1983 deductions for depreciation and room and board comprised about 60 percent of his total reported expenses. We substitute an expense figure of 40 percent, rather than 20 percent, in Duggar's calculations of Bolton's past losses:

$271,257 Bolton's potential gross earnings
-108,503 40 percent deduction for expenses
________
$162,754 Adjusted potential gross earnings

Bolton actually earned $183,397 before trial, according to Dr. Duggar. Because Bolton's actual earnings exceed Dr. Duggar's estimate of his past gross earning capacity (less a more realistic figure for expenses than Dr. Duggar used), we conclude that Dr. Duggar's opinion is factually unsupported and that the award for past *1143 lost earnings is not based on facts or assumed facts supported by the record. LCE Art. 705; Thomas v. Petrolane Gas Service Ltd., 588 So.2d 711 (La.App. 2d Cir. 1991), writ denied.
The Fund has not asked that the award for past losses be reversed, but only that it be reduced to $2,312, the amount that defendant's expert, Mr. Cliffe, calculated as Bolton's lost earnings from October-December 1983. We shall amend the judgment to reduce the award to the amount conceded by the Fund.

Future Losses
Dr. Duggar calculated Bolton's loss of future earning capacity as $184,421 by comparing the 1988-1989 average of Furman Wages' gross earnings ($52,965), less 20 percent for expenses ($10,593), with Bolton's 1989 earnings ($28,512), and then projecting the annual differential of about $14,000 over Bolton's remaining work-life expectancy, with adjustments for wage increases and discounting the total to present value.
Mr. Wages had gross earnings of $51,460 in 1988 and $54,469 in 1989. These figures are substantially higher than Bolton's gross earnings of $36,382 in 1981, his best year of earnings before his injury, when he worked for 41 weeks, or about 9½ months of the year. Even at the time of the injury, Mr. Wages was apparently working longer and earning considerably more than Bolton was.
The Fund's expert, Mr. Cliffe, calculated Bolton's annualized 1983 gross earnings, based on his actual gross earnings through the time of his injury in October, as $18,470. Mr. Wages grossed more than twice that much, or $43,855, in 1984, the first complete year after Bolton's injury and the earliest year of Wages' reported earnings.
Throughout his testimony, Dr. Duggar assumed that Bolton could have earned as much as Mr. Wages earned because he was told that the two did similar work and often worked the same jobs. Bolton did not present expert evidence from Dr. Duggar or anyone else, or evidence from the employer of Wages and Bolton to factually substantiate or support his assumption. No witness squarely assessed or supported Bolton's earning capacity, pre- and post-injury.
Bolton argues that the deposition of Toby Boyette, another of his co-workers at Max Welders, which was taken after trial to rebut defense evidence about the downturn in oil-related industries during the 1980's, shows that Boyette's earnings from 1984-1990 were comparable to those of Mr. Wages. The defense evidence was presented by deposition of an expert witness, Dr. Loren Scott, that was, by agreement of the parties, taken after the trial concluded and filed in the record as a trial exhibit.
Before the trial concluded, the trial court asked Bolton's attorney whether he anticipated offering any evidence to rebut the testimony of the defense expert. Bolton's attorney said that he did not, and did not later move to reopen the case to introduce Boyette's deposition. Boyette's deposition was not formally introduced as part of the trial evidence, but was simply filed in the clerk's office after the trial concluded. Under these circumstances, we do not consider the deposition as a part of the appellate record. URCA Rule 2-1.7; State, Department of Highways v. Colby, 321 So.2d 878 (La.App. 1st Cir.1975), writ denied.
We must conclude that Bolton has not proved that his future earning capacity as a contract welder would exceed $50,000 per year, as Dr. Duggar assumed.
Even if we adopt the gross earnings potential of $38,751 per year that was used by Dr. Duggar in calculating Bolton's past economic losses ($271,257 for seven years, or $38,751 per year), and subtract 40 percent for expenses ($15,500), we arrive at an annual adjusted gross earning capacity of $23,251. Bolton has earned more than that each year since 1986. Bolton does not argue or suggest that his earnings at his present employment will decrease in the future.
Bolton emphasizes that his earnings after the injury, ranging from $23,000-29,000, have never exceeded $36,682, the amount he grossed in 1981. The proper comparison, however, is between what we have called Bolton's adjusted gross income *1144 as a self-employed businessman before the injury (gross income less declared expenses) and his wages as an employee after the injury. Nolan v. Jefferson Downs, Inc., 592 So.2d 831, 841 (La.App. 5th Cir. 1991), writ denied. Bolton's highest adjusted gross annual income before his injury was $13,500. This amount is substantially less than his lowest annual earnings after the injury (about $23,000).
The Fund's expert assigned no value for Bolton's future economic losses because the average of his post-injury earnings ($26,000) was more than twice as much as the average of his pre-injury adjusted gross earnings ($11,000).
We recognize the proper measure of the damages for Bolton's lost earning capacity is not Bolton's actual pre-injury earnings. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984); Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987), writ denied. The expert's projections in this area, however, must have a factual basis in the record and the award must not be based on speculation, possibility or conjecture. Wactor, Thomas v. Petrolane, supra.
Consequently, we find that Bolton has not proved that his earning capacity is as greatly decreased as Dr. Duggar opined. When we adjust, even conservatively as we have done, Dr. Duggar's figures for gross earning capacity and expenses downward, we reach a figure that is less than what Bolton has consistently earned each year since 1986, which was five years before the trial and three years after the injury.
We must conclude the evidence in this record does not support any award for loss of future earning capacity.

CONCLUSION
The trial court judgment awarded Mr. Bolton $430,233.10 and awarded Mrs. Bolton $50,616.70. The award to Mr. Bolton includes $3,015.10 in medical expenses, which are not at issue on appeal. The Boltons have not contested defendant's argument that the award of $616.70 for Mrs. Bolton's medical expenses is not legally recoverable.

DECREE
We amend the judgment to reduce Mrs. Bolton's award to $50,000 for her loss of consortium, and to reduce Mr. Bolton's total award to $205,327.10, for his general damages, medical expenses and past lost earnings of $2,312.
Costs of the appeal are assessed one-half to defendant and one-half to plaintiffs.
AFFIRMED AS AMENDED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, LINDSAY, HIGHTOWER and STEWART, JJ.
Rehearing denied.